IN THE

# SUPREME COURT OF TENNESSEE,

FOR THE

# WESTERN DIVISION.

JACKSON, APRIL TERM, 1889.

---

GREENLAW, Executor, *v.* PETTIT.

(*Jackson.* April 1, 1889.)

1. CHANCERY PLEADING AND PRACTICE. *Decree, based upon petition filed in pending cause, void when. Notice.*

Decree, in a pending Chancery cause, and between parties thereto, is void when based wholly upon matters presented by *ex parte* petition filed therein, which are not within the scope of the original pleadings—notice, of this new and independent suit made up within the old one, not having been given to or waived by the party sought to be thereby affected.

Cases cited and approved: Easley *v.* Tarkington, 5 Bax., 592; Randolph *v.* Bank, 9 Lea, 63.

2. SAME. *Same. Same. Solicitor's unauthorized appearance.*

In such case the solicitor of a party in the original cause has no authority, by virtue of his retainer, to appear for his client in defense of the petition.

Greenlaw *v.* Pettit.

3. SAME. · *Decree making compromise without consent of parties void.*

Chancery Court has no power to make compromise for parties *sui juris* without their consent. Decree undertaking to do so is void.

4. SUBROGATION. *Between joint debtors.*

A joint debtor, who has discharged any part of the joint liability for his co-obligor, is entitled, in the absence of contravening equity, to be substituted to that extent to all securities held by the common creditor.

5. SAME. *Same. Denied when.*

The right of subrogation, being a pure equity, will be enforced only in favor of a meritorious claim, and where it can be done without injustice to the debtor and his other creditors.

  Hence it will be denied, especially as against other creditors, where the party made the payment upon the joint obligation, for which he seeks subrogation, agreeing to waive that right for a valuable consideration; or where he is indebted to the party against whom he seeks subrogation in a larger sum than that paid.

Cases cited and approved: Belcher *v.* Wickersham, 9 Bax., 120; 8 Penn. St., 347.

FROM SHELBY.

Appeal from Chancery Court of Shelby County. W. W. McDOWELL, Ch.

METCALF & WALKER for complainant.

GANTT & PATTERSON for respondent.

LURTON, J.  On October 21, 1872, W. B. Greenlaw and M. J. Wicks were indebted, by open account, to the defendants, R. T. Wilson & Co., in the sum of $47,014.50.  The debt, having been contracted

and payable in New York, bore, by agreement, interest at the rate of ten per cent.

On the 12th of February, 1873, Wicks paid $6,400 on this debt, leaving due March 31, 1873, $42,633.56. On the latter date W. B. Greenlaw delivered to R. T. Wilson & Co. the five notes of himself and H. L. Brinkley, each for $4,947.01, due respectively on the 4th days of November, December, January, February, and March thereafter. These notes aggregated $24,735.06, and were secured by a mortgage upon Brinkley's property. These notes, amounting to one-half of the original debt and interest due from Greenlaw & Wicks, were accepted as payment *pro tanto* of the joint account, and duly credited as a payment and extinguishment of that amount of the joint debt. This left a balance which, with interest, amounted, on the 31st of March, 1874, to $19,688.55. On the 30th of March, 1874, Wicks paid on this balance $11;384.68; and on May 4, 1874, Greenlaw paid the further sum of $1,700, leaving a balance May 31, 1874, of $6,728.45, and this was the sum due on this joint debt at the date of Greenlaw's death in August, 1875. On the 24th of November, 1875, his executor—the complainant—paid, out of a policy of life insurance, the further sum of $5,000, and on the same day Wilson & Co., from the individual deposit account of W. B. Greenlaw, transferred the sum of $2,748.19 to the joint account of Wicks & Greenlaw, thus completing the payment of this joint debt. The proof shows that the notes of Greenlaw

& Brinkley, amounting to $24,735.06, were, *as be-tween* Greenlaw and Wicks, regarded as a full payment by Greenlaw of his one-half of the joint debt to R. T. Wilson & Co., and hence Greenlaw alone, as between himself and Wicks, undertook to pay off these notes. Before Greenlaw's death he had paid off in full one of these notes and upon another the further sum of $1,166.64, and after his death Wilson & Co., out of his individual deposit account with them, applied the further sum of $6,576.51, in equal sums upon the notes still outstanding.

The application of the individual account of Greenlaw to the payment of the balance of the account due from Wicks & Greenlaw and upon the unpaid notes of Brinkley & Greenlaw, was by virtue of an agreement between W. B. Greenlaw and R. T. Wilson & Co., and was assented to by the executor of the former. In addition to the sums paid directly to Wilson & Co. by Greenlaw, he paid the further sum of $833.33, on account of expenses incurred by them in a litigation resulting from an effort to collect a collateral held by them as a security and belonging jointly to Wicks & Greenlaw. Thus the sums paid out by W. B. Greenlaw or his executor, on account of the joint liability of Wicks & Greenlaw, were as follows:

| | | |
|---|---|---|
| March 31, 1873 | $24,735 | 06 |
| May 4, 1874 | 1,700 | 00 |
| November 30, 1874 | 833 | 33 |
| November 24, 1875 | 5,000 | 00 |
| November 24, 1875 | 2,748 | 19—$35,016 58 |

The sums paid by Wicks were:

February 12, 1873 ................$ 6,400 00
March 30, 1874.................... 11,384 68—$17,784 68

Excess of payments made by Greenlaw .....$17,231 90

Not including interest, the balance due from Wicks to Greenlaw on account of these overpayments on this joint debt would be $8,615.95, being one-half of this excess.

Wicks & Greenlaw, in order to secure their joint indebtedness to R. T. Wilson & Co., assigned and transferred to them, in 1872, one-third interest in a claim for $150,000 against the North and South Railroad Company, being a claim for commissions for sale of bonds issued by that corporation. They also undertook to give a lien on a lot in the city of Memphis at the corner of Union and Second Streets, in which they were at that time jointly interested, but which ultimately become the exclusive property of Greenlaw. In 1882, seven years after the death of Greenlaw, some $48,000 was collected by R. T. Wilson & Co., on account of the interest of Wicks & Greenlaw in the claim against N. & S. R. R. Co. After paying out of this sum the balance, with interest, still due to them upon the notes of Brinkley & Greenlaw, there remained a balance of some $22,000. This balance was claimed to be the interest of M. J. Wicks in this asset, *and, as such,* it was paid over to a receiver, appointed in a proceeding in the Chancery Court at Memphis, who has paid out the same to assignees of Wicks who held and claimed upon a transfer

made subsequent to that made by Wicks & Greenlaw to R. T. Wilson & Co. These assignees are not innocent purchasers for a valuable consideration, but are creditors of M. J. Wicks, and as such are entitled to hold only the interest of Wicks, whatever that may turn out to be, under the facts showing his relation to this joint debt, and as affected by the general balance as between Wicks & Greenlaw on that and other accounts.

Complainant's contention is, that he is entitled to be subrogated to the lien of R. T. Wilson & Co., on the interest of Wicks in the collateral held by them to secure the joint debt of Wicks & Greenlaw, and that this lien exists against the fund arising from collection of that collateral, and may be enforced against the assignees of the fund, they not being innocent purchasers, and therefore only entitled to Wicks' interest, subject to the lien claimed by him. That the fund must be treated as if in court, and complainant reimbursed out of it, for one-half of the excess of payments made by Greenlaw over those made by Wicks, upon the joint debt. Upon the facts so far stated complainant would seem clearly entitled to the relief he asks, but the situation is rendered much more complicated by certain defenses arising upon other facts now necessary to be stated.

In 1881 there was pending in the Chancery Court at Memphis a general insolvent bill for the administration in that court of the estate of W. B. Greenlaw. This bill had been filed by one Wallace, ·

claiming to be a creditor.   R. T. Wilson & Co.
had filed and proved their claim upon the unpaid
notes of Brinkley & Greenlaw.   On March 3,
1881, they filed a petition in the same case, sug-
gesting that they were willing to compromise
their claim against Greenlaw (assuming it to be
half of the amount due on the Brinkley & Green-
law notes) by accepting in satisfaction thereof Green-
law's half of the claim for commissions against the
North & South Railroad Company, being the claim
held as collateral security upon the debt of Wicks
and Greenlaw, as heretofore explained; and also the
interest of Greenlaw in the Memphis lot heretofore
mentioned.   On this petition a reference was ordered,
and the Master directed to report upon the advis-
ability of the proposed compromise.   The master,
upon proof, reported that such a settlement was
advisable, and on December 17, 1881, the court con-
firmed this report, and decreed to R. T. Wilson &
Co. the one-half of the joint claim of Wicks &
Greenlaw in the collateral held by the former firm,
and Greenlaw's interest in the Memphis lot, in full
satisfaction of all liability of Greenlaw's estate to
Wilson & Co.   About the same time an order was
made appointing Mr. T. B. Turley receiver of the
interest of M. J. Wicks in said claim, and author-
izing him to collect or compromise it.   On Jan-
uary 15, 1882, Mr. Turley, representing what was
supposed to be Wicks' interest in said claim, and R.
T. Wilson & Co., representing Greenlaw's interest,
effected a compromise by which $48,750 was received

in full of the one-third interest of Wicks & Greenlaw in this claim. One of the objects of this bill is to set aside this decree of compromise, and to recover the Memphis lot decreed to Wilson & Co., and to recover, out of Wicks' interest in the fund, arising from the collection of the collateral held by Wilson & Co., one-half of Greenlaw's payments made on the joint debt in excess of those made by Wicks. The Chancellor annulled the decree of compromise, and decreed that complainant was entitled to recover the Memphis lot, but refused any relief as against Wicks' interest in the fund arising from the collection of the claim against the railroad company. Complainant alone files the record here for error. The recovery of the Memphis lot from H. L. Brinkley, to whom Wilson & Co. had assigned it, is not now questioned, Brinkley not appealing from the decree of the Chancellor. The decree of the learned Chancellor annulling the compromise decree, by which the Memphis lot and Greenlaw's interest in the Wicks & Greenlaw collateral had been transferred to Wilson & Co., was clearly correct. The petition asking such compromise was never properly filed. The relief sought was not germain to the scope of the case in which it was filed. No notice of the filing of the petition was ever given the executor of W. B. Greenlaw. While it is true that the counsel who represented the executor in the insolvent bill did undertake to enter the appearance of his client, yet he did so without any authority, general or special. His retainer, by the

executor, as counsel in the insolvent proceeding, did not authorize him to appear for or bind his client in a new proceeding wholly foreign to the scope of the pleadings in the original case. Complainant was not a resident of the county of Shelby, and is shown never to have been aware of this novel and extraordinary petition for a compromise until long after the, decree had been rendered and the fund collected and distributed.

The power of the Court to pronounce a decree in terms compromising a litigation between parties *sui juris*, and not based upon the express consent of the parties, is more than questionable. Courts exist alone to determine the right as between litigants, and not to compromise rights. A compromise *ex vi termini* means a contract. Courts are organized to administer remedies, and not to make contracts. The Chancery Court, in certain special cases, may authorize guardians, trustees, and others acting in a representative capacity to make contracts, but where parties are *sui juris*, no power exists in any Court to compel a compromise of rights by means of a decree or judgment.

In this particular case the facts upon which the Clerk and Master reported, advising a compromise, were not the real facts of the case. The petition did not in any sense contain the real state of the case, and yet it showed on its face that the same compromise had been rejected by the executor.

Aside from all questions of fraud, the decree was a nullity upon both grounds before considered.

*First.* That the matter presented by the petition was wholly beyond the scope of the original pleadings. It was a new and independent suit, made up within the old one, and no notice was given the party sought to be effected. A decree pronounced under such a state of facts is void. *Easley* v. *Tarkington*, 5 Bax., 592; *Randolph* v. *Merchants Bank*, 9 Lea, 63.

*Second.* It was void because it was not based upon consent, but in terms compelled a compromise between parties capable of acting for themselves.

The decree awarding to Wilson & Co. Greenlaw's one-half interest in the collateral held by them being annulled, leaves the matter in this situation: The fund resulting from the collection of this claim was $48,750. Out of this Wilson & Co. were entitled to retain, as pledges, enough to satisfy the balance due them on the unpaid notes of Brinkley & Greenlaw, this collateral standing as a security for these notes, although they had been accepted as payment on the original joint debt of Wicks & Greenlaw. They claimed at the time that this balance amounted to $26,764.36. This sum they accordingly applied to these notes. This left $21,985.64, which was paid over to Mr. Turley, as Receiver of "Wicks' interest," as if the share or interest of Wicks in this fund, and this was, by the Receiver, paid over to assignees of Wicks, claiming under assignments subject to that made to R. T. Wilson & Co.

One contention of complainant is, that after the payment of Wilson & Co. the remainder of the fund belonged equally to Wicks & Greenlaw, and that one-half of this balance was the absolute, individual property of his testator, and that it, having been improperly paid over to assignees of Wicks, may be now, in this proceeding, reclaimed and recovered from such assignees.

All other questions out of the way, this might be conceded. But whether complainant is entitled to such a decree will depend upon a number of other considerations.

*First.* We have already stated that, as between Greenlaw & Wicks, the notes of Brinkley & Greenlaw were to be regarded as a payment by the former of his one-half of the joint liability, and he, of course, would be bound to pay and discharge these notes. If Wicks had subsequently paid the remainder of the joint debt after it had been credited with the Brinkley & Greenlaw notes, there would not have arisen any claim in consequence of an excess of payment made by Greenlaw. The payments of each would have been equal, Greenlaw alone being bound to pay off the Brinkley & Greenlaw notes, they having been accepted as a payment by him upon the joint debt. But Wicks did not pay off the remainder of the joint debt. Upon the contrary, as we have already shown, Greenlaw subsequently paid $8,615.90, which Wicks was bound to pay as between them. On the other hand, Greenlaw alone was bound, as between him-

self and Wicks, to pay off the notes of Greenlaw & Brinkley. The sum necessary to discharge them should, therefore, as between them, be charged only to Greenlaw's interest in the fund arising from collection of the collateral jointly owned by them. Clearly it follows that Greenlaw's one-half interest in this fund was, therefore, rightly applied to the payment of his own liability. The claim, therefore, that Greenlaw's estate was the absolute owner of one-half the fund left after the debt of the pledges had been paid, cannot be sustained, and if complainant is to have any relief it must be upon some other basis. Indeed, the surplus of this collateral belonged alone to Wicks, and passed to his assignees, unless Greenlaw has some equitable lien thereon, by reason of his excess of payments on the 'joint debt for which it was pledged as a security. If any such equitable lien exists it must depend upon complainants' right to be subrogated to the lien of R. T. Wilson & Co. upon this collateral, or the fund arising from its collection.

The debt was a joint debt. The collateral was a joint asset. Each joint debtor is regarded as the principal debtor for that part of the debt which he ought to pay, and as a surety for his creditor as to that part of the debt which ought to be discharged by him. He has the same right to be subrogated to the securities held by the creditor which exists in behalf of a surety who pays in excess of his share of the joint burden. Sheldon on Subrogation, 200.

The right of complainant to the relief he seeks upon the doctrine just stated is resisted by defendant Pettit, who claims that the payments made by Greenlaw in excess of his proportion of the joint debt were made under an agreement, made subsequently to Greenlaw's payment of his part of the original debt in the notes of Brinkley & Greenlaw, whereby he assumed and agreed to pay the remainder of the joint debt in consideration of his indebtedness to Wicks on other accounts. As between two joint debtors there may rest upon one the ultimate obligation of paying it, and in such case there cannot arise any right of subrogation, for the reason that the payment by the one whose obligation it was to pay, operates as an extinguishment of the debt and a discharge of all liens held by the creditor for his security. Sheldon Subrogation, Section 46.

On the contrary, Mr. Sheldon, in his very valuable work on Subrogation, says: "If, as between joint debtors, it has become the duty of one of them to pay the entire debt, the others, if they shall be compelled to pay it, will be subrogated to the securities and means of payment held by the creditors against the former, just as if they had been sureties of the former *eo nomine.*" Section 170.

But whether this excess of payment by Greenlaw was due to an agreement between himself and his co-debtor that he would assume and pay off the remainder of the joint debt, is immaterial, if, as a matter of fact, the balance of accounts as between

the joint debtors is in favor of the defendant at the time. the equity of subrogation is sought. If a surety or joint obligator invokes the equity of subrogation he must do equity. The right of subrogation is a pure equity and is allowed only in relief of a meritorious creditor, and only when and where it does not conflict with the legal or equitable rights of other creditors of the common debtor. So, says Mr. Sheldon, the equity "will not be allowed to a surety who is himself indebted to his principal against whom he asks to be subrogated without his first satisfying . such debt." *Ibid*, Secs. 112 and 107; *Neff* v. *Miller*, 8 Penn. St., 347.

This defense involves an examination into the general account as between the joint debtors, Wicks & Greenlaw. They had, for many years, been upon terms of most familiar business and social intimacy. They had been jointly engaged in many enterprises, and prior to the payments made by Greenlaw beyond his own proportion of the debt due to R. T. Wilson & Co., they held large accounts against each other growing out of other transactions.

In June, 1874, they undertook to have a settlement of their open matters and called upon an old mutual friend, Col. Sam Tate, to aid them in such settlement. They soon disagreed and entered into a written stipulation whereby they submitted all their accounts- to Col. Tate for settlement, and agreed to abide by his decision. In pursuance of this arrangement the claims of each, and the pa-

pers relating to same, were turned over to Col. Tate. In the effort to reach a settlement before the submission, they had each made statements as to their claims and each had made admissions in the presence and hearing of Tate as to parts of the accounts between them. Col. Tate, who has been several times examined as a witness as to the accounts between these two gentlemen, says that he at the time took a memorandum of such items as they agreed upon. This settlement was not concluded at the time of W. B. Greenlaw's death in 1875, but Col. Tate, from the papers of the parties, and upon the admissions made mutually, and upon his personal knowledge concerning many of the matters, has undertaken· to state the account between them. It is well enough to observe that we have not had the benefit of the testimony of either Mr. Greenlaw or Mr. Wicks, the former having died long before this controversy arose, and the latter about the time the bill was filed. In order that the full import of the admissions made by Mr. Greenlaw to Col. Tate at the time of the attempted settlement between himself and Mr. Wicks may be understood, it is important to call attention to the fact that on the 4th of May, 1874, Mr. Greenlaw paid to Wilson & Co., on the joint debt of Wicks & Greenlaw, $1,700, and this was the first payment made in excess of his proportion, and on the 1st of June, 1874, this attempt at a settlement was had and the admissions made by Greenlaw to Wicks in the hearing of Tate and relied upon by

31

defendant, were made in the course of this effort
to settle their mutual accounts. This item of $1,700,
Col. Tate says, was claimed by Greenlaw as a
credit upon his general account against Wicks, and
was admitted by the latter as a proper charge on
such account. Tate further states, that *the balance
then due to Wilson & Co. of $6,728.45 was, by mutual
agreement, assumed by Greenlaw, and that he then
claimed and was allowed a credit for this balance so
assumed by him on his account with Wicks.* These
are two of the items which he says the parties
agreed upon. This assumption of the balance of
this joint debt he states was because Greenlaw was
indebted to Wicks upon other matters. This evi-
dence, as to the assumption by Greenlaw of this
debt, is uncontradicted, and establishes the proposi-
tion that Greenlaw did, as between himself and
Wicks, his co-debtor, assume the obligation of paying
off the remainder of their joint debt to Wilson &
Co. Having thus assumed and agreed to pay this
debt, and having obtained a credit on his general
account with Wicks for the sum thus assumed, can
it be held that the subsequent payment of the debt
by his executor entitles him to be subrogated to
the security held by the creditor? This subsequent
payment was in pursuance of the agreement and
operated to extinguish the debt, and, as a conse-
quence, discharged the liens which the creditor held
for his protection. Plainly, there was no intention
to be subrogated by the payment. If the facts and
circumstances show definitely that at the time of

payment the right of subrogation was not intended to be exercised, but on the contrary that the purpose was not to keep the debt alive but to extinguish it, then the right of subrogation cannot be held to exist. *Belcher* v. *Wickersham*, 9 Baxt., 120.

The assumption of this debt, and the agreement to pay it and take a credit therefor upon his general account, indicate that there was no intent to be subrogated.

If any consideration were necessary to support the agreement to assume the balance of the joint debt to R. T. Wilson & Co., it is found in the state of the accounts between these parties; and indeed, if the balance, upon a general accounting, be against the complainant, no subrogation can be demanded, regardless of the agreement to assume the Wilson debt.

The account, as stated by Col. Tate, shows a balance in favor of Wicks, including interest up to 1881, of $10,798.29. In this Greenlaw is credited with his excess of payment on the Wilson debt.

One item of charge against Greenlaw is as follows:

January 3, 1873. To amount of my one-half of money advanced you for purchase of M. & L. R. R. R. bonds, second mortgage:

| | |
|---|---:|
| Total amount | $77,780 60 |
| My half | 38,890 32 |
| To interest from January 3, 1873, to June 1, 1881, eight years and five months | 19,639 61 |
| Total on this | $58,529 93 |

This entire charge is disputed, and it is the only disputed item in the account of Wicks against W. B. Greenlaw. If this item be correct, then the balance still due Wicks, after crediting Greenlaw with the payments made for him to Wilson & Co., is as above stated—something over $10,000. The history of this claim is rather dimly disclosed by the testimony in the transcript. In 1870 or 1871 Wicks had advanced to Greenlaw, who had a large contract for the M. & L. R. R. R., the sum of $77,780.60. This sum was to be repaid in second mortgage bonds of that road at fifty-seven and a half cents on the dollar. Probably a part of the bonds were delivered under the contract. Whether demand was made by Wicks for the remainder does not clearly appear. It is, however, stated by Col. Tate that the bonds were not delivered by Greenlaw because he had hypothecated them, and was not in a situation to redeem, and that finally the bonds became worthless by the · insolvency of the Railroad Company, and the. exhaustion of its property in payment of its first mortgage bonds.

In January, 1873, Wicks, then holding Greenlaw's obligation for the amount of bonds as above, made the following proposal:

"MEMPHIS, January 6, 1873.

" *W. B. Greenlaw, Esq.:*

"DEAR SIR:—I have advanced to you $77,780.60, which I was to take in second mortgage bonds of M. & L. R. R. R. at fifty-seven and one-half cents on the dollar. This sum, together with the in-

terest on the same, or interest coupons on the bonds, will amount to over $80,000. I propose to release you from the payment of this sum on the delivery of the bonds to me if you will execute a satisfactory note to the Southern Security Co. for $50,000, with seven per cent. interest, at twelve months, for me. If required I will allow my third interest in the stock in the lease of the M. & C. R. R. to go with your note as collateral security.

"Signed, M. J. WICKS."

This proposition was accepted. Greenlaw, however, joined with him in the purchase of this obligation Col. Sam Tate and H. L. Brinkley. These three jointly executed the note required to be given the Southern Security Co.

To secure this note Tate, Greenlaw, and Brinkley placed with it as collateral certain interests in a lease on the Memphis & Charleston Railroad. They likewise pledged a similar interest owned by Wicks. The Security Company, the payees of this note, agreed to receive, in payment of the note, their interests in the lease in the event the note was not paid at maturity. The note was not paid, and the pledged interests in the lease were accepted as payment. Thus Wicks' interest was used by these purchasers of Greenlaw's obligation in payment of their note. Tate and Greenlaw had contracted with Wicks, that in the event they did so use his interest in the lease, that they would pay him for the same the sum of $16,666.66, with interest at seven per cent., from January 6, 1873.

When Wicks' proposition to sell Greenlaw's receipt (as it is designated in the record) was accepted, he executed and delivered the following paper:

"MEMPHIS, January 3, 1873.

"Received of W. B. Greenlaw, Sam Tate, and H. L. Brinkley, $78,780.65, money advanced by me to W. B. Greenlaw on account of raising the road bed on the M. & L. R. R. R. through the Mississippi River bottom, which amount of money I was to receive in second mortgage bonds of said company, at fifty-seven and one-half cents on the dollar. I hereby authorize the said Greenlaw to deliver the amount of said bonds the above sum of money would have entitled me to have received to the said Tate, Greenlaw, and Brinkley. I was to have said bonds at the price named, with July, 1872, and January, 1873, coupons, to which the said parties are entitled, and I agree to return to said Greenlaw all the bonds I have received on account of said contract when called on, and upon delivery of the bonds to the parties aforesaid this receipt to be a full acquittance to the said Greenlaw for the money advanced by me on said bonds aforesaid.               Signed,               M. J. WICKS."

Col. Tate, between January, 1874, and June, 1874, paid his one half of the $16,666.66 which he and Greenlaw were to pay Wicks in the event they used his interest in the Memphis & Charleston lease in the payment of their note to the Southern Se-

curity Company. This payment had been made by Tate before the assumption by Greenlaw of Wicks' portion of their joint debt to Wilson & Co., this debt having been assumed at the time of the attempted adjustment of their accounts on June 1, 1874. At the same time that Tate made this payment to Wicks he sold and transferred to him his interest in Greenlaw's original obligation. By the sale of this obligation, or "receipt," to Tate, Greenlaw, and Brinkley, Wicks had parted with his claim against Greenlaw, but by this subsequent re-purchase he re-acquired a one-third interest with original obligations. He likewise held Greenlaw's obligation to pay him $8,333.33 on account of his use of his interest in the lease. And this is the situation in which this claim stood at the time of the attempted settlement between Greenlaw and Wicks, and at the time the former assumed, on account of his indebtedness to the latter, to pay the balance of the debt to Wilson & Co. We have heretofore stated that Greenlaw had delivered a part of the bonds to Wicks, and we have seen that the latter, when he sold the receipt, agreed to turn these bonds over to the joint purchasers of the obligation. The proof shows that these bonds were delivered to Tate by Wicks, and Tate returned them to Greenlaw, though the consideration does not appear.

The second mortgage bonds of the Memphis & Little Rock Railroad were a marketable security down to 1873, and worth fully if not more than the contract price, at which Wicks was to get them.

After that date their value does not appear from
the proof. From all the circumstances we are in-
clined to the opinion that this contract between
Greenlaw and Wicks became a money obligation,
and that Greenlaw's use of the bonds by hypothe-
cating them, obligated him to return the money he
had been advanced on their purchase. The cir-
cumstance of the purchase of his "receipt" for
$50,000 by himself and Brinkley and Tate, and his
acceptance of the bonds once delivered on the ob-
ligation, tend to show that the parties themselves
regarded the "receipt" as a money obligation, and
not a mere sale of bonds then probably worthless.
The item as charged to Greenlaw in the account,
as stated· by Tate, is, however, erroneous. He has
treated the interest re-acquired by Wicks from him-
self as a one-half interest, when in fact it was but
a one-third. To this, however, should be added
$8,333.33, amount due Wicks on account of his
share in the lease. The account as thus corrected
leaves the balance still largely in favor of Wicks.
But if it be assumed that the "receipt" of Green-
law is not a money obligation, and had not become
one by any default with which Greenlaw is charg-
able; if we assume on the contrary that the obli-
gation of Greenlaw was merely to deliver these
bonds upon demand, and that no demand is shown
by the proof to have been made, then the matter
would be in this situation : Wicks, in June, 1874,
was entittled to call on Greenlaw for such an
amount of the second mortgage bonds of the M. &

L. R. R. R., as one-third of $78,000 would buy at fifty-seven and a half cents on the dollar. Greenlaw did not then have the bonds to meet the demand, having hypothecated them instead of holding subject to his contract of sale. In view of the liability to Wicks, and his inability to redeem the bonds he had sold, he assumes to pay Wicks' portion of the joint debt to R. T. Wilson & Co., and take a credit therefor in a settlement with Wicks of this bond contract, and the other matters unsettled between them. The consideration is abundantly sufficient to support his agreement, and clearly operates to defeat any claim for subrogation, whereby the claims of equally meritorious creditors would be defeated, creditors *who took assignments after Greenlaw had assumed to pay the balance of the Wilson debt, and had been allowed a credit for it, as if it had in fact been paid, in his account with Wicks.* There is no error in the decree of the learned Chancellor, and his decree must be affirmed, with costs.