**Lisa HAGER and Bonnie Lents, Appellants,**

v.

**J. Arnold FITZGERALD, Appellee.**

Court of Appeals of Tennessee, Eastern Section.

Aug. 16, 1996.

Permission to Appeal Denied by Supreme Court Dec. 2, 1996.

Nathan E. Brooks, Chattanooga, for Appellants.

W.B. Luther, Shane Usary, Chattanooga, for Appellee.

## OPINION

FRANKS, Judge.

Plaintiffs brought this action against their attorney, alleging that he was guilty of "fraud, outrageous conduct, legal malpractice, and breach of fiduciary duty" in purchasing the proceeds of the structured settlements entered by the plaintiffs.

The Trial Court granted summary judgment on behalf of the defendant, after the discovery depositions of the plaintiffs were taken and defendant filed an affidavit of an "investment specialist".

■ We begin our analysis by observing that no presumption of correctness attaches to decisions granting summary judgment, *Roberts v. Roberts,* 845 S.W.2d 225 (Tenn. App.1992), and the Court must view all affidavits and depositions in the light most favorable to the opponent of the motion and draw legitimate conclusions of fact therefrom in the opponent's favor. *Berry v. Whitworth,* 576 S.W.2d 351 (Tenn.App.1978).

Plaintiffs' depositions reveal that both plaintiffs were addicted to drugs and alcohol, and that defendant had represented them in various and sundry matters, including criminal charges. Plaintiffs employed defendant to represent them in an action for damages for personal injuries arising from an automo-

bile accident, which cases were settled, with a part of the settlement paid to plaintiffs at the time of signing releases, and the remaining consideration was to be paid in the form of a structured settlement, which the plaintiffs entered with the insurance carrier for the tort feasor.

The structured settlement agreements were entered with Tennessee Farmers Life Insurance Company which provided annuity payments, and the agreement by its terms prohibited assignment of the ownership of the policy. The agreement provided for sixty monthly equal payments to each plaintiff and their attorney.

The defendant had engaged in the practice of advancing money to these plaintiffs, and after three of the monthly payments had been made and disbursed to plaintiffs by defendant, one of the plaintiffs approached defendant about borrowing money, and he advised that they had passed their "limit" that month. This plaintiff then approached a loan company about borrowing money, advising of her monthly payments. She candidly admits that the reason for wanting the loan was "probably wanting to get high". The loan company insisted upon some documentation of plaintiff's monthly payments, and the plaintiff went to defendant's office seeking copies of the structured settlement agreement, whereupon the lawyer informed her that she didn't want to do that, and asked her to return to his office that night. Both plaintiffs went to defendant's office that evening in a state of intoxication and signed agreements with the defendant wherein he purchased the proceeds from the structured settlement agreement. One of the plaintiffs over the remaining fifty-seven months would have received $32,348.10. The defendant paid this plaintiff $18,676.00. The other plaintiff would have received over the same period $25,597.54. The defendant paid $15,500.00 as consideration.

One of the plaintiffs explained their position thus, in the course of the deposition:

Q. Let me ask you, generally, what is your complaint against Arnold? How do you think Arnold did you wrong in this case, this automobile accident case?

A. By buying my settlement when—I trusted Arnold.

Q. Yeah.

A. He—as far as I was concerned, he had not let me down. That's why I didn't bother to keep track of this amount of money, or that amount of money. I trusted Arnold.

Q. You say he did you wrong by buying your settlement?

A. Knowing the shape that I was in, he knew that I needed that monthly check each month.

Q. Uh-huh.

A. Over that time period, not all at once.

Q. Uh-huh.

A. Not with my problem. Not with my frame of mind.

Q. So you wanted him to dole this money out to you. Is that what you wanted?

A. I wanted him to keep it like it was supposed to be.

The affidavit of the "investment specialist" opines that the affiant had discussed the terms of the annuity policies with an employee of Tennessee Farmers Mutual Insurance Company, and determined from that conversation that the policy had no surrender value and no cash value as of October 6, 1993, and based upon these discussions and market experience, she concluded that defendant had "overpaid" to the plaintiffs for their annuities.

The time-honored rule in this jurisdiction in resolving disputes between attorneys and their clients is stated in *Waller, Lansden, Dortch, Davis v. Haney*, 851 S.W.2d 131 (Tenn.1992):

"Owing to the confidential and fiduciary relation between an attorney and his client, and to the influence of the attorney over his client, growing out of that relation, courts of law, and especially of equity, scrutinize most closely all transactions between an attorney and his client. To sustain a transaction of advantage to himself with his client, the attorney has the burden of showing, not only that he used no undue influence, but that he gave his client all the information and advice which is (sic) would

have been his duty to give if he himself had not been interested and that the transaction was as beneficial to the client as it would have been had the client dealt with stranger."

*Id.* 131 (Quoting *Hutchinson v. Crowder,* 8 Tenn.Civ.App. 114 (1917).)

This Court observed in *Cultra v. Douglas,* 60 Tenn.App. 116, 444 S.W.2d 575 (1969) that:

The relationship of attorney and client is an extremely delicate and fiduciary one so far as the duty of the attorney toward his client is concerned, and the courts jealously hold the attorney to the utmost good faith in the discharge of his duties.

The Court then quoted with approval from 7 C.J.S. *Attorney and Client* sec. 127, at pp. 964–965, the general rule governing dealings between attorneys and clients:

"Rather, all such transactions or dealings are regarded with suspicion and disfavor, are discouraged by the policy of the law, and will be closely scrutinized by the courts, which will lean against the attorney; and if it appears that the transaction is unfair that the client has been overreached or unduly influenced, it may be avoided at his election, either in courts of law, or in courts of equity on the principles that govern the conduct and dealings of trustees or fiduciaries generally."

And the Supreme Court most recently said in *Matlock v. Simpson,* 902 S.W.2d 384 (Tenn. 1995) that the rule is that the existence of a confidential relationship followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises that may be rebutted only by clear and convincing evidence of fairness of the transaction.

■ The general rule followed in most, if not all, jurisdictions presumes that undue influence or fraud attaches to any assignment or conveyance that an attorney takes from his client, while the relationship of attorney/client exists, and that no presumption of innocence or improbability of wrongdoing exists in favor of the attorney. 7 Am.Jur.2d *Attorneys at Law,* § 122 and 7A C.J.S. *Attorney and Client,* § 241.

■ The affidavit of the expert does not satisfy the criteria of T.R.C.P. Rule 56.05 and Rule 703, Tennessee Rules of Evidence. Moreover, this is the type of case where only upon a full trial can the issues be properly developed, and we conclude that summary judgment is not an appropriate procedure for the disposition of the issues in this case. *See Fowler v. Happy Goodman Family,* 575 S.W.2d 496 (Tenn.1978). Accordingly, we vacate the summary judgment and remand for further proceedings consistent with this opinion, with costs assessed to defendant.

GODDARD, P.J., and SUSANO, J., concur.