IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 13, 2006 Session

# IN RE: ESTATE OF W. GARNETT LADD, SR., W. GARNETT LADD, III, ET AL. v. ROBERT C. MARKS

**Appeal from the Chancery Court for Montgomery County**
**No. 95-P9-165      Michael R. Jones, Judge**

---

**No. M2005-02089-COA-R3-CV - Filed on April 30, 2007**

---

The matters at issue pertain to the fee awarded a Co-Executor of an estate. The Co-Executor appeals contending he was entitled to a contractual fee equal to five percent of the gross estate based on an oral agreement with the ninety-four year old widow of the testator who served as his co-executor. The Special Master and Chancellor made concurrent findings that the appellant had failed to properly administer the estate. They also found that his claimed excuse, that he was acting according to the wishes of his ninety-four year old Co-Executrix, did not relieve him of his affirmative fiduciary duties as a personal representative. The Chancellor awarded him a fee of $25,000 for his services as Co-Executor. We have concluded he is entitled to no fee for his services.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part, Modified in Part, Vacated in Part**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Neil M. McIntire, Nashville, Tennessee, for the appellant, Robert C. Marks.

F. Evans Harvill, Clarksville, Tennessee, for the appellees, W. Garnett Ladd, III and Gerda Ladd Mayo.

## OPINION

W. Garnett Ladd, Sr., died testate on December 25, 1994 leaving a three million dollar estate to be administered. He was survived by his ninety-four (94) year old wife, Gerda Ladd, one son, Garnett Ladd, Jr., and two adult grandchildren, Garnett Ladd, III and Gerda Ladd Mayo. Mr. Ladd bequeathed one-half of his estate outright to his wife with the rest and residue of his estate to a family trust,[1] of which his wife was the primary beneficiary for the remainder of her life, and his son,

---

[1]Some specific bequests were included in the will, which comprised approximately one percent of the estate.

Garnett Ladd, Jr., and grandchildren, Garnett Ladd, III and Gerda Ladd Mayo, were the residual beneficiaries.[2]

The Last Will and Testament, which had been prepared in 1989 by attorney Robert C. Marks, designated the testator's wife, Mrs. Ladd, and Dempsey Marks[3] as Co-Executors. Robert Marks was designated as the Alternate Co-Executor in the event his father, Dempsey Marks, predeceased the testator, which he did. As a consequence of Dempsey Marks' death, Robert Marks was the next in line to serve as Co-Executor with Mrs. Ladd.

Robert Marks filed a Petition to Probate the 1989 will of Garnett Ladd, Sr. (the "testator"). The Petition was granted, and on February 5, 1995, Letters Testamentary were issued to Mrs. Ladd and Robert Marks (hereinafter "Marks") to serve as Co-Executors.

At the time the Letters Testamentary were issued, Mrs. Ladd was ninety-four (94) years of age and was residing in a nursing home, where she had been for two years due to declining health and the infirmities of age. As a consequence of her infirmities, which necessitated numerous trips to the hospital for various health problems, Marks assumed the primary responsibility for administering the estate. Marks also served as the attorney for the estate and assumed the responsibility to prepare the estate tax return.

The estate was principally comprised of approximately $2.28 million in stocks and bonds, $515,000 of deposits in bank accounts, and $28,000 in real estate. Shortly after his appointment as Co-Executor, Marks inventoried the safe deposit boxes, opened a bank account for the estate, and attended to some of the preliminary tasks associated with the administration of the estate.

Marks testified that he consulted with Mrs. Ladd prior to Marks filing the estate's Form 706 Federal Estate Income Tax Return, which was filed on September 27, 1995, regarding the compensation he would receive for serving as Co-Executor. He stated they orally agreed that he would receive a fee for his services as a Co-Executor in an amount equal to five (5%) percent of the three million dollar gross estate. There are, however, no letters or written agreements to evidence the fee agreement. The only documentation concerning Marks's fee is found in the cancelled checks paid to Marks.[4] The record reflects that Marks received $166,200 for his services to the estate.

---

[2]The decedent's son, Garnett Ladd, Jr., a residual beneficiary of the will and trust, predeceased his mother, Mrs. Ladd, leaving only the testator's grandchildren, Garnett Ladd, III and Gerda Ladd Mayo as the residual beneficiaries of the trust.

[3]Dempsey Marks was the father of Robert Marks, who drafted the will.

[4]Prior to 1997, the fees were paid to the order of the law firm in which Marks was a partner, Marks, Shell, Maness & Marks. Marks left the firm in 1997. All payments remitted thereafter were paid directly to Marks.

In addition to the fee Marks received for his service as Co-Executor, Marks received a fee of $17,000. Marks testified that this fee, which was paid by the estate, was compensation for legal services he rendered to Mrs. Ladd as her personal attorney.

Mrs. Ladd died during the administration of the estate, in September of 1998, almost four years after the estate was opened by Marks. At the time of her death, Marks had not distributed the bequest to Mrs. Ladd, and had not funded the trust which was to receive the rest and residue of the estate. Only an insignificant portion of the estate had been distributed when Mrs. Ladd died.

Three days after Mrs. Ladd's death, the residual beneficiaries, Garnett Ladd, III and Gerda Ladd Mayo (hereinafter collectively the "Plaintiffs"), filed a Petition in the Chancery Court seeking an accounting by Marks. A consent decree was entered which required Marks to provide a complete inventory and accounting of the estate.[5] Ten days later, Marks provided an incomplete accounting. Finding the accounting wholly inadequate, Plaintiffs filed numerous pleadings including, *inter alia*, a Petition to require Marks to show cause why he should not be held in contempt for failure to comply with the court's decree, a Motion for Distribution, and a Motion to Distribute Trust Assets.

After Marks' repeated failures to provide a sufficient accounting, Plaintiffs commenced this action with the filing of a Complaint and Devastavit. The Complaint was filed on May 17, 1999, almost four and one-half years after Marks opened the estate. In the Complaint, Plaintiffs alleged that Marks failed in his professional and fiduciary duty to appropriately administer the estate by: (1) failing to properly marshal assets; (2) failing to cause assets to be made productive and to maximize income during the period of administration; (3) failing to communicate with any beneficiary of the estate, other than his co-executrix; and (4) failing to distribute and close the estate in a prompt manner. For relief, Plaintiffs requested a complete and total accounting of all financial activities undertaken by Marks, a judgment awarded against Marks for his malfeasance and nonfeasance in his failure to properly perform the tasks of an executor, reimbursement of the fees Marks received from the estate, and reimbursement for an insurance policy which Marks failed to properly process. Marks filed an Answer to the Complaint in July, 1999, denying, *inter alia,* any negligence in the administration of the estate and denying that his fees were excessive.

In March of 2003, over eight years after the estate was opened, attorney Stennis Little was appointed Special Master pursuant to Tenn. R. Civ. P. 53.[6] Pursuant to the order, the Special Master

---

[5]To be included in the accounting were a copy of the Federal Estate Tax return, the Tennessee Inheritance Tax return, together with any other tax clearances from the State of Tennessee or the Internal Revenue Service, copies of the Estate income tax return, and all other pertinent information regarding the execution of the estate.

[6]Tenn. R. Civ. P. 53.04(1), which governs the role of a special master, provides:
The master shall prepare a report upon the matters submitted to him by the order of reference and, if required to make findings of fact and conclusions of law, he shall set them forth in the report. He shall file the report with the clerk of the court and, unless otherwise directed by the order of reference, shall file with it a transcript of the proceedings and of the evidence and the original exhibits. The clerk shall forthwith mail to all parties notice of the filing.

was to receive evidence and report to the Court his findings and conclusions with respect to the following:

> There is pending in this Court a Complaint and Devastavit which was filed May 17,1999, an accounting by Robert C. Marks, Executor under the Will of W. Garnett Ladd, Sr., which was filed on June 8, 1999, an exception to the accounting which was filed on June 25, 1999, and an Answer of Robert C. Marks to the Complaint and Devastavit which was filed on July 8, 1999. The Special Master will report in writing to this Court his findings and conclusions with respect to any issues raised by these pleadings and upon which the parties present evidence for the Special Master's consideration.

In November, 2003, the Special Master filed his Findings of Fact and Conclusions of Law. One month later, the Special Master modified his Findings of Fact and Conclusions of Law. The Special Master's findings were highly critical of Marks' services, or lack thereof, as an executor. The Special Master made forty-three findings of fact, almost all of which were critical of Marks' acts and omissions. Specifically, the Special Master found that in the four years between his appointment and the filing of the Complaint, Marks failed to distribute Mrs. Ladd's share of the estate outright and failed to fund the trust. Based on his findings of fact, the Special Master concluded that Marks failed to carry out his fiduciary responsibilities as Co-Executor and that Marks "should receive zero ($0.00) dollars for his performance as Co-Executor and judgment should be issued for the return of the executor's fees." The Special Master, however, recommended that Marks be awarded a fee "for the initial gathering of all of the assets and the filing of all of the returns, both estate and income" of $25,000.

The Special Master also found that the fee Marks received for representation of Mrs. Ladd, which was paid out of the estate account, was "excessive and undocumented," and he recommended a judgment in that amount be entered against Marks. Additionally, the Special Master found that a $25,000 U.S. Treasury Bond listed in the inventory was unaccounted for, and unless Marks accounted for the bond, he recommended Marks reimburse the estate for the loss.

Marks filed Objections to the Master's Findings of Fact and Conclusions of Law after which Plaintiffs filed their Response. The Chancellor conducted a hearing following which he confirmed the Special Master's findings and all but one of his conclusions, that pertaining to the $25,000 fee to be paid to Marks, which the Chancellor classified as an executor's fee, not an attorney's fee.

The Chancellor also made additional findings that were not in conflict with the findings and conclusions of the Special Master.[7] One of the conclusions made by the Chancellor, a subject not addressed by the Special Master, was that Mrs. Ladd's ability to make an informed decision was impaired when, in 1995, she allegedly orally agreed to pay Marks a fee of five (5%) percent for his

---

[7]The Chancery Court confirmed the $25,000 award to Marks but held that it should be classified as an executor's fee, not an attorney's fee, as implicitly suggested in the Special Master's Report.

services as Co-Executor. The Chancellor's finding was based on testimony from Mrs. Ladd's health care providers. Based on this finding, the Chancellor held that the fee agreement between Mrs. Ladd and Marks was not a valid contract.

An Order addressing the above matters was entered on April 14, 2004. Thereafter, the Chancellor entered an Order awarding a final judgment against Marks in the amount of $213,558, along with prejudgment thereon. This appeal followed.

Marks contends the Chancellor erred by: (1) reducing the fee for services he rendered to the estate to $25,000; (2) requiring he refund the $17,000 fee[8] he was paid for services as Mrs. Ladd's personal attorney; (3) holding him responsible for the missing $25,000 Treasury Bond; (4) assessing prejudgment interest against him; and (5) awarding the post-judgment interest retroactive to a date prior to the entry of the final judgment.

## STANDARD OF REVIEW

The court's order referring certain matters to the Special Master, the Special Master's report, and the trial court's concurrence in the report affect our standard of review. Tenn. Code Ann. § 27-1-113 (2006); *Manis v. Manis*, 49 S.W.3d 295, 301 (Tenn. Ct. App. 2001). Where there has been a concurrent finding of the Special Master and Chancellor, this Court may not disturb the concurrent findings. Tenn. Code Ann. § 27-1-113. A concurrent finding of a master and chancellor is conclusive on appeal, except where it is upon an issue not proper to be referred, where it is based on an error of law or a mixed question of fact and law, or where it is not supported by any material evidence. *Coates v. Thompson*, 713 S.W.2d 83, 84 (Tenn. Ct. App. 1986). This standard of review is similar to our standard when reviewing a jury verdict; we must affirm if there is any material evidence to support the trial court's concurrence. *See Id*.; Tenn. R. App. P. 13(d). This heightened standard of review only applies to findings that are made by both the Special Master and the Chancery Court. *See Manis*, 49 S.W.3d at 301. Thus, the findings of fact made by the Chancery Court but not by the Special Master are not subject to the aforementioned standard of review.

When the findings of the Special Master and the trial court are not concurrent, the standard of review of a trial court's findings of fact is *de novo*, and we presume that the findings of fact are correct unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). Issues of law are reviewed *de novo* with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

---

[8]The Special Master found the amount of the fee paid was $19,000, but the Chancellor found the amount paid was $17,000.

## MARKS' CO-EXECUTOR FEE

Marks contends he is entitled to retain $166,200 paid for his services to the estate. We have concluded that Marks breached his fiduciary duty to the estate by failing to competently and timely render the services required of him as Co-Executor and, therefore, he is not entitled to a fee for his service, or the lack thereof, to the estate.

An executor of an estate occupies a fiduciary position. *Mason v. Pearson*, 668 S.W.2d 656, 663 (Tenn. Ct. App. 1984). As such, the executor must deal with the beneficiaries in utmost good faith and "exercise the same degree of diligence and caution that reasonably prudent business persons would employ in the management of their own affairs." *McFarlin v. McFarlin*, 785 S.W.2d 367, 369-70 (Tenn. Ct. App. 1990) (citing *In re Estate of Inman*, 588 S.W.2d 763, 767 (Tenn. Ct. App. 1979); *In re Estate of Cuneo*, 475 S.W.2d 672, 676 (1971); 2 H. PHILLIPS & J. ROBINSON, PRITCHARD ON WILLS AND ADMINISTRATION OF ESTATES § 715 (4th ed. 1984)).

In addition to general fiduciary duties requiring an executor to act with diligence and prudence, an executor owes specific duties to the estate and the beneficiaries of the estate. Most relevant to the present matter is the executor's duty to "collect and disburse the assets as *expeditiously* as possible under the circumstances. . . ." 2 JACK W. ROBINSON, SR. & JEFF MOBLEY, PRITCHARD ON WILLS AND ADMINISTRATION OF ESTATES § 737, at 333 (5th ed.1994) (hereinafter "PRITCHARD") (emphasis added). The executor owes a duty to marshal and collect the assets of an estate within a reasonable time; discharge his statutory duties and distribute the estate in a timely manner; and close his administration as quickly as possible. *Estate of Doyle v. Hunt*, 60 S.W.3d 838, 844-45 (Tenn. Ct. App. 2001) (citing *McFarlin*, 785 S.W.2d at 370; *Love v. First Nat'l Bank*, 646 S.W.2d 163, 166 (Tenn. Ct. App. 1982); *Campbell v. Miller*, 562 S.W.2d 827, 832 (Tenn. Ct. App. 1977)). This duty arises because the law favors prompt administration of estates. *See Burris v. McConnell*, 216 S.W.2d 10, 12 (1948). An executor also has a duty to communicate with beneficiaries and the court in a professional manner. *See Estate of Doyle*, 60 S.W.3d at 846 (noting an executor's failure to communicate).

Generally, courts are cautious not to hold executors liable upon slight grounds. *See* 2 PRITCHARD § 734, at 328. Rather, an executor who acts reasonably and in good faith while carrying out his duties will be shielded from liability if his judgment simply turned out to be wrong in light of subsequent events. *Id*. An executor who fails to competently, prudently, and reasonably discharge his duties as required by law, however, finds no protection in his lack of judgment as viewed in hindsight. *Id*. at 328-29; *see also McFarlin*, 785 S.W.2d at 372.

### A.

Marks contends he had an agreement with Mrs. Ladd, his Co-Executrix, which bound the estate to pay a fee of five (5%) percent of the gross estate for his services to the estate. We find this contention to be without merit.

We find no authority to support Marks' contention that the estate was bound by the alleged fee agreement he entered into with his Co-Executrix, Mrs. Ladd. To the contrary, an executor who enters into a fee agreement with another that pertains to the administration of the estate merely binds the executor, not the estate. As we have learned from situations where an executor retains legal counsel to assist in the administration of the estate, the executor, not the estate, is liable for the legal fees incurred unless and until the court determines the services were required and the fee was reasonable. *Union Planters Nat. Bank v. Dedman*, 86 S.W.3d 515, 521 (Tenn. Ct. App. 2001) (citing *In re Estate of Wallace*, 829 S.W.2d 696, 703 (Tenn. Ct. App. 1992). If the fees can be shown to have been required and to inure to the benefit of the entire estate and not to one or more of the interested parties, the fees may be charged to the estate as an administrative expense. *Id.*

The Chancellor found the fee agreement between Marks and Mrs. Ladd invalid due to her diminished capacity. Nevertheless, assuming *arguendo* the agreement between Mrs. Ladd and Marks was a valid contract, only Mrs. Ladd was bound by the terms of the agreement.[9] Accordingly, we find no basis to conclude that the alleged fee agreement Marks entered into with the Co-Executrix bound the estate.[10]

The timing of the fee agreement between Marks and his Co-Executrix raises questions of the propriety of the agreement. Marks had been serving as Co-Executor for several months when he claims to have entered into the fee agreement with his Co-Executrix, Mrs. Ladd. This is problematic because an executor occupies a fiduciary position, and thus owes a fiduciary duty to the beneficiaries of the estate. *McFarlin*, 785 S.W.2d at 369 (citing *Mason*, 668 S.W.2d at 663). As such, the executor must deal with the beneficiaries in utmost good faith and "exercise the same degree of diligence and caution that reasonably prudent business persons would employ in the management of their own affairs." *Id*. at 369-70 (citations omitted). The fact Marks entered into the fee agreement while serving as Co-Executor, at a time he had a duty to act in the utmost good faith to the beneficiaries subjects the fee agreement to the utmost scrutiny; however, we have already determined the agreement is not binding against the estate. Therefore, it is not necessary that we scrutinize the propriety of the fee agreement.

---

[9] The Chancery Court found the fee agreement was invalid because Mrs. Ladd's decision making ability was impaired at the time of the formation of the contract with Marks.

[10] We also recognize that the fee arrangement Marks contends he entered into was with the then ninety-four year old Mrs. Ladd, who was his personal client. Moreover, she was infirm, a resident of a nursing home, and the primary beneficiary of the estate. An attorney enjoys a confidential relationship with his or her client which triggers judicial scrutiny for fairness of a transaction wherein the client bestows a benefit on the attorney. *Hager v. Fitzgerald*, 934 S.W.2d 668, 671 (Tenn. Ct. App. 1996). With regard to transactions between an attorney and client, Tennessee courts will "scrutinize most closely" all such transactions. *Waller, Lansden, Dortch, & Davis v. Haney*, 851 S.W.2d 131, 131 (Tenn. 1992). Furthermore, because of the fiduciary duties imposed "by virtue of their status as co-executors, co-trustees, and directors, the court had the authority to closely scrutinize any transaction wherein the fiduciary decided to hire himself." *In re Estate of Wakefield,* No. M1998-00921-COA-R3-CV, 2001 WL 1566117, at * 17 (Tenn. Ct. App. Dec. 10, 2001).

B.

An executor is generally entitled to reasonable compensation for services and to payment for reasonable expenses incurred in good faith for the benefit of the estate. *In Re Estate of Wallace*, 829 S.W.2d at 700-01; *In Re Estate of Perlberg*, 694 S.W.2d 304, 307 (Tenn. Ct. App. 1984); *see* Tenn. Code Ann. § 30-2-606; *see also See In re Estate of Wakefield*, No. M1998-00921-COA-R3-CV, 2001 WL 1566117, at * 18 (Tenn. Ct. App. Dec. 10, 2001) (citing AUSTIN WAKEMAN SCOTT & WILLIAM FRANKLIN FRATCHER, THE LAW OF TRUSTS § 242.9, at 305 (4th ed. 1988)). The determination of the compensation is left to the discretion of the trial court. 2 PRITCHARD § 861, at 532.

> The real question concerning compensation of an executor is one of fair compensation for the time the representative was employed, the expenses he necessarily incurred, the services he rendered, the benefits he conferred, the responsibility he encountered, and the diligence, faithfulness, promptness, and capacity he displayed, in the performance of his duties: in a word, he is entitled to what he reasonably deserves under all the circumstances of the particular case.

2 PRITCHARD § 861, at 532. Such a determination "must be made in light of all the relevant circumstances, including the extent of the executor's responsibilities, the nature of the services rendered, the promptness and adequacy of the services, and the value of the benefits conferred." *In re Estate of Wallace*, 829 S.W.2d at 701; *In re Estate of McSwain*, No. M2001-02309-COA-R3-CV, 2002 WL 1763540, at *2 (Tenn. Ct. App. July 31, 2002); *In Re Estate of Griffith*, 452 S.W.2d 895, 902 (Tenn. Ct. App. 1969).

The Special Master made forty-three findings of fact which were critical of Marks' failed attempts to administer the estate. The Chancellor confirmed the above findings. As a result, the findings are concurrent and essentially engraved in stone pursuant to the heightened standard found in Tenn. Code Ann. § 27-1-113. The following are some of the more relevant findings of fact:

- Under Item III of the will, the executors were to make a specific bequest of Ladd Oil Company Stock to W. Garnett Ladd, Jr.[11] *The stock was not distributed as of the date the Complaint was filed.*
- Under Item IV of the will, the executors were to make a bequest of $1,000 to Arvel Hunter. *This bequest was not distributed as of the date the Complaint was filed.*
- Under Item V of the will, one-third of all of the Decedent's checking and savings accounts with the Sovran Bank/Clarksville were to be conveyed to the trustees of the First Baptist Church, Clarksville, Tennessee. *This bequest had not been fulfilled as of the date the Complaint was filed.*

---

[11]Garnett Ladd, Jr., disclaimed the stock. Thus, the stock was to go to his children.

- Under Item VI of the will, one-third of all of the Decedent's checking and savings accounts with the Sovran Bank/Clarksville were to be conveyed to the trustees of the Southern Baptist Seminary of Louisville, Kentucky. *This bequest had not been fulfilled as of the date the Complaint was filed.*
- Under Item VII of the will, one-third of all of the Decedent's checking and savings accounts with the Sovran Bank/Clarksville were to be conveyed to the Governing Board of Belmont College. *This bequest had not been fulfilled as of the date the Complaint was filed.*
- The Sovran Bank/Clarksville Bank Account [number omitted] which was to be divided and distributed to three charitable entities, was never retitled after the probating of the Will into an estate account. The Defendant admits that the interest rate on the account could have been higher if the transfer was made. *The disbursement was not made until May 21, 1999.*
- Under Item VIII of the will, the sum of $15,000 was to be conveyed to Garnett Ladd, III as trustee, to be held for the benefit of Geneva Guerin for her lifetime. *This bequest was not fulfilled as of the day the Complaint was filed.*
- Under Item X of the will, one-half of the gross estate (including life insurance and jointly held property), less the value of specific bequests to Gerda Price Ladd, was to go to Gerda Price Ladd, the deceased's spouse, outright and free of trust. *No disbursement had been made as of the date of the Complaint.*
- The Will further provides that all remaining assets in the estate were to be placed in a Marital Trust for the benefit of Gerda Price Ladd for her lifetime and upon her death, one-half would go to W. Garnett Ladd, Jr., or his issue *per stirpes* and one-half would go to the Plaintiffs, share and share alike. *The Marital Trust was never established or funded.*
- W. Garnett Ladd, Sr., at the time of his death, had numerous bank accounts and/or money market accounts with seven different institutions. *As of the date the complaint was filed, accounts at four of the seven institutions remained in W. Garnett Ladd, Sr.'s name and under his social security number in accounts with low interest rates that at the time could have been higher.* (emphasis added)

Based on his findings, the Special Master concluded that Marks should reimburse the estate the entire fee he received for his services as Co-Executor, being $166,200.[12] In pertinent part the Special Master concluded

> there is clearly a gross failure on the part of the Defendant to communicate with the ultimate beneficiaries and others that have an interest in the estate, including the Court. The record does not state why he repeatedly ignored requests for documents,

---

[12]The Special Master, however, recommended that Marks be awarded $25,000 for "the initial gathering of all of the assets and the filing of all of the returns, both estate and income."

refused to return telephone calls, and did not show up for scheduled meetings. He also did not communicate with the ultimate beneficiaries and the Court in a professional manner.

Therefore, for the reasons cited in Issue I and for the reasons cited herein, it is the Special Master's unequivocal conclusion, that the Defendant did not perform and he did not carry out his fiduciary obligations and responsibilities as a Co-executor in the estate of W. Garnett Ladd, Sr.

"Faithful discharge of duty is necessary to demand rightfully any compensation. A dishonest or negligent executor or administrator . . . will not, as a general rule, be allowed *anything* for his services." 2 PRITCHARD § 861, at 532 (emphasis added). An executor who has otherwise failed to administer an estate in a competent manner may not only be denied compensation for his role as the executor but may be required to personally pay for financial harm he has created, such as interest and penalties incurred resulting from failure to timely file required documents. *Id*; *see also McFarlin*, 785 S.W.2d at 372.

The Special Master concluded that Marks "should receive zero ($0.00) dollars for his performance as Co-Executor and judgment should be issued for the return of the executor's fees." The Special Master, however, recommended that Marks be awarded a fee of $25,000 "for the initial gathering of all of the assets and the filing of all of the returns, both estate and income."

The Chancellor confirmed the Special Master's findings but modified the recommendation regarding the fee. As the Chancellor explained:

Since Mr. Marks was a co-executor and also the attorney for the estate, this court believes that as executor he is entitled to reasonable compensation as executor only. The Special Master estimated an attorney fee of $25,000 for the valuable services rendered as an attorney. The court finds that a fee of $25,000 is reasonable based on the magnitude of the estate and the type of assets. The report of the Special Master is confirmed as to the amount of the fee, but that it shall be an executor's fee not attorney fee.

As previously explained, concurrent "findings of fact" by the Special Master and Chancellor are conclusive on appeal. That is not the case, however, for matters that are considered mixed questions of fact and law. *Pearson v. Gillenwaters*, 42 S.W. 9, 12 (Tenn. 1897); *In re Estate of Wallace*, 829 S.W.2d at 700. Issues concerning the amount of compensation to be paid executors and attorneys constitute mixed questions of fact and law and, therefore, they are not subject to the heightened standard of review. *See* 2 PRITCHARD § 861, at 529-30 (citing *In re Estate of Wallace*, 829 S.W.2d at 700). As our Supreme Court held over a century ago:

The concurrence of the Master and Chancellor as to the compensation due to an administrator for his services, and to an attorney for his fees, or a receiver or other

-10-

trustee for his services, is not such a concurrence on a question of fact as is embraced in the rule giving such concurrence the weight and effect of a finding by a jury. At most it is on the part of the Clerk and Master and the Chancellor but an expression of opinion or an estimate; and, while their estimates are entitled to weight because they are familiar with such fees and allowances as a rule, and with the services rendered in the particular case, still, their concurrence does not have the effect as contended, and the Court of Chancery Appeals was authorized to put its estimate upon the allowance independent of the Chancellor and Master, and likewise, this Court can review the estimate of the Court of Chancery Appeals, because it is not a fact found by that Court, but their judgment and estimate upon the facts and upon the record.

*Pearson*, 42 S.W. at 12. Three decades later, the Supreme Court further explained the reasoning behind the rule by stating:

[T]he question of the value of services rendered by an attorney, or receiver, or other trustee, when the facts have been set forth in proper detail as to the actual services rendered, is a matter purely of opinion and estimate, as to which the witnesses testifying, and the Master himself, can have no better basis for a fair opinion, if indeed so good, as the members of an Appellate Court, possessed normally of training and experience which peculiarly fits them to form and to review such an opinion.

*Dale v. Hartman*, 6 S.W.2d 319, 321 (Tenn. 1928).

Accordingly the concurrent findings of fact which address the many deficiencies in Marks' performance as Co-Executor are conclusive; however, the fee awarded by the Chancellor is not conclusive and is subject to the more liberal standard set forth above.

In light of all the relevant circumstances, including the extent of the executor's responsibilities, the nature of the services rendered, which were both delinquent and inadequate, and the value of the benefits conferred on the estate, which was insignificant, we have concluded that Marks is not entitled to any compensation for his failed attempt to administer the Ladd estate. The fact Marks conferred a short-term benefit to the estate by initially gathering assets and filing the requisite tax documents is offset by the fact the net gain to the estate was for naught. This is because Marks' failure to administer the estate and to provide an accounting are the reasons for this litigation and the expenses resulting therefrom.

We also find Marks' attempt to excuse his actions, or lack thereof, by casting the blame on Mrs. Ladd, his ninety-four year old Co-Executrix, without merit for two reasons. One, his factual contentions are not substantiated by the record. Two, a co-executor may be held liable for the acts or omissions of his co-executor in which he concurs, acquiesces, or to which he assents. *In re Inman's Estate*, 588 S.W.2d 763, 767 (Tenn. Ct. App. 1979).

Over four years passed between Mr. Ladd's death and the filing of the Complaint during which time Marks accomplished little toward the administration of the estate, the assets remained captive to Marks' inattention to his duties, and the estate incurred considerable expense by bringing this action to obtain a proper accounting by Marks.

For all of the foregoing reasons, we have concluded that Marks is not entitled to a fee for the various services he claims to have rendered for the estate.[13]

### ATTORNEY FEES FOR REPRESENTING MRS. LADD INDIVIDUALLY

During the time Marks was serving inadequately as Co-Executor of the estate, he additionally rendered services for Mrs. Ladd as her personal attorney. For his service as her attorney, Marks received payment of $17,000 in fees, which was paid out of the estate account. According to Marks, the fees pertained to services he rendered while conferring with Mrs. Ladd regarding her individual stocks and a possible gift to her daughter Gerda Mayo, and for visiting Mrs. Ladd in the hospital.

Although the services were rendered for the sole benefit of Mrs. Ladd individually, not in her capacity as Co-Executrix, the fee was paid to Marks out of the estate account in 1998 when Mrs. Ladd was ninety-seven years old and suffering from a diminished mental capacity.[14]

The Special Master found that Marks failed to keep any record or time sheets of the services rendered for the individual benefit of Mrs. Ladd. As stated in the Report of the Special Master, "[Marks] has offered no documentation from his files regarding what he discussed with Gerda Ladd and whether he counseled her regarding legal issues." The Chancellor confirmed the Special Master's findings, stating in the April 14, 2004 Opinion:

> This court can find nothing in the evidence to establish any work as an attorney for Mrs. Ladd individually. Mr. Marks did visit Mrs. Ladd, but it does not appear that he performed much, if any, work as an attorney. He certainly made no attempts to avoid inheritance tax on her estate. The report of the Special Master as to the attorney fee is confirmed. Mr. Marks shall pay the [$17,000][15] to the estate of Gerda Ladd.

---

[13]Marks further contends the trial court erred in determining that he was responsible for returning all of the executor's fee paid despite only receiving twenty (20%) of that fee. We find this argument without merit. This matter is rightly between Marks and his former law firm.

[14]Dr. James R. Smith, Mrs. Ladd's physician, and Brenda Mansell, the care plan coordinator for Spring Meadows Health Care Center, testified that during this time period, Mrs. Ladd's mental capacity was significantly diminished. Dr. James R. Smith testified that he noticed an appreciable change in Mrs. Ladd's mental capacity as far back as Christmas of 1994. Moreover, Dr. Smith testified that following her hospitalization in January, 1998, "I don't think she was well enough to handle physical or mental affairs after that time." Ms. Mansell testified that Mrs. Ladd's condition was impaired as far back as 1996.

[15]The initial order read "$19,000+/-" but was modified by a later order to read "$17,000."

Concurrent findings by the Special Master and Chancellor are conclusive upon us unless they are not supported by any material evidence. *Coates*, 713 S.W.2d at 84. Accordingly, we must affirm if there is any material evidence to support the trial court's concurrence. *See Id*. Having found substantial and material evidence to support the concurrent findings that Marks failed to establish any work as an attorney for Mrs. Ladd individually, we, therefore, affirm the judgment of the Chancellor on this issue.

## THE $25,000 U.S. TREASURY BOND

The Chancery Court awarded the estate a judgment against Marks in the amount of $25,000, plus prejudgment interest, due to Marks' failure to account for a $25,000 bond owned by the testator and his wife at the time of the testator's death. Marks contends the court erred by holding him personally liable for the unaccounted for $25,000 bond. We agree with Marks on this issue.

The Special Master found that the $25,000 bond was never deposited in the estate account, its whereabouts were unknown, and Marks had failed to account for it. Based on these findings, the Special Master recommended that Marks be held liable for the unaccounted for bond. The Chancellor affirmed the conclusion by stating, "The report of the Special Master as to the $25,000 asset that remains unaccounted for is confirmed."

The Chancellor confirmed the report of the Special Master and, therefore, the concurrent findings of the Special Master and Chancellor are conclusively proven for purposes of this appeal. The Chancellor, however, additionally found that the bond in the amount of $25,000 "came into Mr. Marks' hands." The Special Master did not make a concurrent finding that the bond "came into Mr. Marks' hands." Thus, this finding by the Chancellor is subject to the preponderance of the evidence standard pursuant to Tenn. R. App. R. 13(d), and having examined the record, we find no evidence to support a finding that the $25,000 bond at issue "came into Mr. Marks' hands."

There is, however, a concurrent finding by the Special Master and Chancellor that is of great significance, which is the bond Marks failed to account for was jointly owned by Mr. and Mrs. Ladd. The finding is both conclusive and supported by the fact the bond was listed on Form 706 of the Federal Estate Tax Return under schedule E, which is the schedule on which jointly owned property is to be listed.

This finding is significant to the issue at hand because property that is held jointly by a husband and wife is presumed to be held as tenants by the entirety. *See Smith v. Sovran Bank Cent. South*, 792 S.W.2d 928, 930 (Tenn. Ct. App. 1990); *First Am. Nat. Bank v. Evans*, 417 S.W.2d 778, 780-781 (Tenn. 1967); *Edwards v. Edwards*, 713 S.W.2d 642, 647 (Tenn. 1986). *Grahl v. Davis*, 971 S.W.2d 373, 378 (Tenn. 1998) (citing *Sloan v. Jones*, 241 S.W.2d 506, 507 (1951)). When one spouse dies, "ownership of tenancy by the entirety property immediately vests in the survivor. . . ." *Grahl*, 971 S.W.2d at 378. Both personal property and real property may be held in tenancy by the entirety, and certificates of deposit and bank accounts may be held by tenancy by the entirety with the right of survivorship. *Id*. (citing *White v. Watson*, 571 S.W.2d 493, 495 (Tenn. App. 1978); *Smith*

*v. Haire*, 181 S.W. 161 (1915) (certificates of deposit); and *Griffin*, 632 S.W.2d at 532; *Sloan*, 241 S.W.2d at 506 (bank accounts)). It naturally follows that bonds may be held in the same manner.

The right of survivorship attains further significance to the matter at issue because personal property held by a husband and wife does not become part of the probate estate for purposes of administration. Assets subject to the right of survivorship, such as the bond at issue, pass to the surviving spouse by operation of law and do not become part of the probate assets in the hands of the personal representative of the deceased spouse. 2 PRITCHARD § 645, at 171. Therefore, the unaccounted for bond passed directly to Mrs. Ladd by right of survivorship and, thus, never became an asset of the estate, and Marks had no duty to administer it as an asset of the probate estate.

The foregoing notwithstanding, an executor may voluntarily undertake a duty to marshal an asset that passed outside of probate; however, neither the Special Master or Chancellor found that Marks assumed a duty with regard to the $25,000, and there is no evidence in the record that he did so. The only evidence linking Marks to the bond is the fact the bond was listed on the deposit box inventory, and the fact that Marks listed the bond as a taxable asset on Form 706 of the Federal Estate Tax Return. Neither fact shows that he ever had possession of the bond. Moreover, reporting the bond as a taxable asset of the estate does not require that Marks possess it nor does that fact suggest that Marks assumed a duty to marshal or protect the bond.

There being no evidence to support a finding the bond came into Marks' hands and no evidence that he assumed a duty to account for the bond as an asset of the estate, we therefore conclude as a matter of law that Marks had no duty to protect or account for the $25,000 bond that passed directly to Mrs. Ladd, by right of survivorship, outside of probate. In the absence of a duty, there can be no breach of a duty and thus no liability.

For these reasons, we must respectfully vacate the judgment against Marks in the amount of $25,000 for the unaccounted for bond.

### PREJUDGMENT INTEREST

On April 23, 2004, Plaintiffs filed a Motion for Prejudgment interest of the executor's fee, the attorney's fee and the missing $25,000 U.S. Treasury Bond. The Chancellor heard the matter and awarded prejudgment interest at the rate of 3.88% on the $166,200 executor's fee, the $17,000 attorney's fee, and the $25,000 bond, with interest to be computed from May 17, 1999, the date this action was commenced.

An award of prejudgment interest is within the sound discretion of the trial court. *Spencer v. A-1 Crane Service*, Inc., 880 S.W.2d 938, 944 (Tenn. 1994); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn. 1992). The trial court's decision to award prejudgment interest will not be disturbed on appeal unless the record reveals a manifest and palpable abuse of discretion. *Id.* Generally stated, the abuse of discretion standard does not authorize an appellate court to merely substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927

(Tenn. 1998). Thus, in cases where the evidence supports the trial court's decision, no abuse of discretion is found. *Id*. (citing *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978) (applying abuse of discretion standard to trial court's decision to deny request for suspended sentence), cert. denied, 439 U.S. 1077, 99 S.Ct. 854, 59 L.Ed.2d 45 (1979)).

We must defer considerably to the trial court's decision. *Scholz v. S.B. Intern., Inc.*, 40 S.W.3d 78, 82 (Tenn. Ct. App. 2000) (citing *Myint*, 970 S.W.2d at 927). However, appellate deference is not synonymous with rubber stamping a trial court's decision. Discretionary decisions remain subject to appellate scrutiny, albeit less strict. Our review is confined to determining whether the trial court has based its decision on applicable legal principles and whether the decision is consistent with the evidence. *Scholz*, 40 S.W.3d at 82-83 (citing *Myint*, 970 S.W.2d at 927; *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999)).

> Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum; provided, that with respect to contracts subject to § 47-14-103, the maximum effective rates of prejudgment interest so awarded shall be the same as set by that section for the particular category of transaction involved. In addition, contracts may expressly provide for the imposition of the same or a different rate of interest to be paid after breach or default within the limits set by § 47-14-103.

Tenn. Code Ann. § 47-14-123 (2006). The principle of equity is the foremost guiding consideration for a trial court when exercising its discretion to award or deny prejudgment interest. *Myint*, 970 S.W.2d at 927; Tenn. Code Ann. § 47-14-123. Basically, "the court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case." *Myint*, 970 S.W.2d at 927. "In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." *Id*. (citations omitted)

In the not-so-distant past, opinions dealing with prejudgment interest left a distinct impression of subtle judicial antipathy toward awarding prejudgment interest unless it was statutorily mandated. *Scholz*, 40 S.W.3d at 81. The decision in *Myint*, however, heralded a departure from the former approach and "requires a re-examination of the factual and legal bases used by the courts to determine whether prejudgment interest should be awarded." *Scholz*, 40 S.W.3d at 81.

> Parties who have been wrongfully deprived of money have been damaged in two ways. First, they have been damaged because they have not received the money to which they are entitled. Second, they have been damaged because they have been deprived of the use of that money from the time they should have received it until the date of judgment. Awards of pre-judgment interest are intended to address the second type of damage. They are based on the recognition that a party is damaged by being

-15-

forced to forego the use of its money over time. Thus, our courts have repeatedly recognized that prejudgment interest is awarded, not to punish the wrong-doer, but to compensate the wronged party for the loss of the use of the money it should have received earlier.

*Scholz*, 40 S.W.3d at 82 (internal citations omitted).

Historically, the two most common reasons for denying prejudgment interest were: one, the "uncertainty of either the existence or amount of an obligation;" and, two, cases wherein the claim is reasonably disputed. *Myint*, 970 S.W.2d at 927-28, n. 7. The decision in *Myint* has supplanted the formerly rigid rules with more flexible guidelines. *Scholz*, 40 S.W.3d at 83. In place of the rigid criteria, the *Myint* Court articulated the following standard:

Simply stated, the court must decide whether the award of pre-judgment interest is fair, given the particular circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize the defendant for wrongdoing.

*Myint*, 970 S.W.2d at 927. As a consequence of the *Myint* decision, the Court shifted the balance to favoring prejudgment interest "whenever doing so will more fully compensate plaintiffs for the loss of use of their funds." *Scholz*, 40 S.W.3d at 83.

Fairness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received. That is not to say that trial courts must grant prejudgment interest in absolutely every case. Prejudgment interest may at times be inappropriate such as (1) when the party seeking prejudgment interest has been so inexcusably dilatory in pursuing a claim that consideration of a claim based on loss of use of the money would have little weight; (2) when the party seeking prejudgment interest has unreasonably delayed the proceedings after suit was filed; or (3) when the party seeking prejudgment interest has already been otherwise compensated for the lost time value of its money.

*Scholz*, 40 S.W.3d at 83 (internal citations omitted).

Here, we can identify six considerations that are consistent with the equitable considerations used to justify an award of prejudgment interest in *Scholz*. *Id.* at 84. One, as the Chancellor stated, Plaintiffs "did not have use of the money" to which they were entitled during the time that it was in Marks' possession. Two, Plaintiffs did not delay unreasonably seeking an accounting. Three, they have not delayed the proceedings. Four, Marks received unwarranted fees. Five, Plaintiffs were deprived of the use of the funds to which they were entitled as a direct result of Marks' errors and omissions. Six, the amount in controversy was reasonably ascertainable.

-16-

Finding no abuse of discretion with regard to the award of prejudgment interest as it pertains to the award at the rate of 3.88% on the $166,200 executor's fee and the $17,000 attorney's fee, with interest to be computed from May 17, 1999, the date this action was commenced, we affirm.

Because we vacated the award of pre-judgment on the $25,000 bond, it is necessary that we remand for calculation of prejudgment interest on the executor's fee and the attorney's fee.

## POST JUDGMENT INTEREST

As his final issue, Marks challenges the retroactive award of post judgment interest. He does not challenge the award of post judgment interest, only the retroactive application of the award.

In the final judgment, which was entered on July 29, 2005, the trial court awarded Plaintiff post judgment interest retroactive to the date of the trial, April 14, 2004, which was completed some fifteen months prior to the entry of the final judgment. Accordingly, the issue to be determined is the date from which post judgment interest accrues. We have determined that date is the date the judgment was entered, which was July 29, 2005.

The relevant statute provides, "Interest shall be computed on every judgment from the day on which the jury or the court, sitting without a jury, returned the verdict without regard to a motion for a new trial." Tenn. Code Ann. § 47-14-122 (2006). Although the relevant provision, "from the day on which . . . the court, sitting without a jury, returned the verdict" is subject to more than one interpretation, we have previously construed the statute in a non-jury trial to mean "post-judgment interest shall run from the date of the entry of the court's judgment." *Varnadoe v. McGhee*, 149 S.W.3d 644, 649 (Tenn. Ct. App. 2004) (dissenting opinion by Crawford); *see State v. Thompson*, 197 S.W.3d 685, 693 (Tenn. 2006).

The final judgment in this matter was entered on July 29, 2005. Therefore, the post-judgment interest should be calculated from July 29, 2005. On remand, post judgment interest on the $25,000 bond should be subtracted from any further calculations.

## IN CONCLUSION

We vacate the award of any fee to Marks for his services to the estate. We additionally vacate the judgment rendered against Marks for failing to account for the $25,000 bond. Further, we modify the effective date of the award of post judgment interest by making it effective as of the date the final judgment was entered and for which interest shall accrue thereafter. The judgment of the trial court is affirmed in all other respects.

This matter is remanded to the trial court for the entry of a judgment consistent with this opinion and for such further proceedings as may be necessary. Costs of appeal are assessed against Robert C. Marks.

_____
FRANK G. CLEMENT, JR., JUDGE