# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
February 5, 2010 Session

# WILLIAM J. BRADLEY v. CHRISTY L. BRADLEY

**Appeal from the Chancery Court for Robertson County**
**No. 18248     Laurence M. McMillan, Chancellor**

---

**No. M2009-01234-COA-R3-CV - Filed July 8, 2010**

---

Mother filed a petition for an increase in child support, which was denied by the trial court based on the findings and recommendations of a special master.  On appeal, Mother challenges the special master's determination that Mother was voluntarily underemployed, that Father should continue to provide Child's health insurance, and that Mother owed Father $498.73 for her share of medical bills incurred on behalf of Child, as well as the special master's calculation of Father's income for child support purposes.  Because we have determined that the special master erred in considering evidence outside the record, we vacate the trial court's decisions regarding Father's income and child support obligation and remand those matters for redetermination.  We affirm the trial court's finding that Mother is underemployed and remand the matter to the trial court for a calculation of imputed income.  We also vacate the trial court's calculation and division of medical bills and remand the matter for reexamination, recalculation and redivison.  The trial court's decision regarding Child's health insurance coverage is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Vacated and Remanded in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S. and FRANK G. CLEMENT, JR., J., joined.

Laurie Lea Doty, White House, Tennessee, for the appellant, Christy L. Bradley.

Charlotte U. Fleming, Springfield, Tennessee, for the appellee, William J. Bradley.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

William J. Bradley ("Father") and Christy L. Bradley ("Mother"), the parents of a minor child ("Child"), divorced in 2004. The parties entered into a Marital Dissolution Agreement and a Permanent Parenting Plan, which set Father's support at $1,000 per month.

Mother filed a petition for an increase in child support on January 16, 2007, claiming that since entry of the final divorce decree, Father had a 15% variance in his income. Father denied this assertion in his answer, filed on February 21, 2007, and claimed that Mother was purposefully underemployed.

On June 2, 2008, the Chancery Court for Robertson County appointed a special master, Lisa Richter, to hear all issues regarding child support modification and discovery.

The First Set of Findings and Recommendations of the Special Master

A hearing before the special master was held on September 22, 2008. The special master issued her findings and recommendations on October 6, 2008. The parties presented four issues for determination: (1) Mother's motion for an increase in child support, (2) Father's allegation that Mother was underemployed, (3) which parent should provide health insurance for Child, and (4) the division of medical bills incurred on Child's behalf.

The special master first addressed the issue of Father's income from 2005 to 2008 in order to determine whether there was a 15% variance in his income.[1] The special master took note of the fact that Father was self-employed and calculated his yearly income by taking his gross income and deducting what the special master believed to be the ordinary and reasonable deductions allowed by the Child Support Guidelines.

Combining income from rental property with income from construction sales, less the cost of commissions and expenses for the construction sales, the special master found that Father's year-to-date income for 2008 was $90,823.10. Thus, Father's average monthly income in 2008 was found to be $10,091.46. Next, the special master concluded that Father's 2007 income was at least $197,827.00, for an average monthly gross income of $16,485.58. The special master then determined that Father's 2006 income was at least

---

[1] Pursuant to Tenn. Comp. R. & Regs. § 1240-2-4-.05(2)(a), a significant variance is required for the modification of a child support order. Under Tenn. Comp. R. & Regs. § 1240-2-4-.05(2)(c), a significant variance exists when there is at least a 15% change between the amount of the current support order and the amount of the proposed presumptive support order.

$181,951.00, for an average monthly gross income of $15,162.58. The special master noted that Father admitted that his 2007 and 2006 income tax returns may not have reflected all of his income from rental properties. Finally, the special master concluded that Father's 2005 income was $137,887.00, for an average monthly gross income of $11,490.58. The special master then averaged Father's monthly gross income from 2005 to 2008 and determined that his average monthly gross income for those years was $13,307.55.

The special master next addressed Mother's income. At the hearing, Mother claimed that she had no income at all in 2007 or 2008. However, the special master noted that Mother owned at least six rental properties during 2007 and sold two homes that she constructed. The special master also observed that "Mother owned and operated a flower shop and video shop at a huge loss according to the Mother, but persisted in this course of action with no diminution in her lifestyle." The special master attributed income to Mother in the amount of $29,300.00 per year for 2007 and 2008.[2] Thus, the special master assigned Mother monthly income of $2,441.67 for 2007 and 2008.

In 2006, Mother reported a loss of $31,738.00 on her income tax return. However, "in examining the income and expenses of both the flower shop and video shop as reflected on her 2006 income tax return," the special master concluded that Mother had income for child support purposes in the amount of $37,533.00, resulting in monthly income of $3,127.75. Mother's 2005 income tax return was not entered into evidence at the trial. However, the special master noted that Mother's 2005 income tax return reflected a loss of $6,012.00 and concluded that, for child support purposes, Mother had annual income of $31,678.00 in 2005, resulting in monthly income of $2,639.83. Averaging Mother's monthly gross income for the last four years, the special master found that Mother's average monthly gross income was $2,662.73.

The special master next addressed Father's allegation that Mother was underemployed, concluding that Mother was willfully and/or voluntarily underemployed under the Child Support Guidelines, Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(2)(ii). The special master concluded that it was not reasonable for Mother to continue as a contractor given the poor residential home sales market, the failure of Mother's side businesses, and the fact that Mother had reported a negative income to the IRS for the last three years. The special master stated the following about Mother's income:

---

[2] The special master cited Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(3)(iv)(I) as the basis for her conclusion. However, this provision does not exist in the Child Support Guidelines. It appears that the special master meant to refer to Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(2)(iv)(I)(III), the provision that allows for the imputation of income in the amount of $29,300 to female parents when there is no reliable evidence of income.

The Mother has been employed in the construction and lending industry for most of her adult life and has a bachelor's degree. Nothing prevents the Mother from working for someone else yet she has not sought work simply saying that she cannot live on minimum wage. Instead, the Mother is asking the Special Master to find that she is able to live on nothing. The Special Master notes that the Mother owns considerable rental property and is not behind on her mortgage or line of credit. Even allowing for the fact that she could use half of her One Thousand Dollars and No Cents ($1000.00) per month child support to pay her mortgage payment, the Special Master is at a loss to explain how the Mother could then afford to buy food for herself and the minor child and to put gas in her Toyota Tundra that she uses for work.

To summarize, the special master found Father's average monthly gross income to be $13,307.55 and Mother's to be $2,662.73. Father's child support obligation had been set at $1,000.00 per month, and he provided health insurance for Child at a rate of $84.81 per month. Based on the Child Support Worksheet she prepared, the special master found that Father's "presumptive child support order" was $899.00 per month. Thus, the variance between Father's ordered child support order and his presumptive child support order was $101.00. In order for a 15% variance to exist under Tenn. Comp. R. & Regs. § 1240-2-4-.05(2)(c), that figure would have to be $150.00 or more. Thus, the special master concluded that there was not a 15% variance and Father's child support was fixed at $1,000.00 per month.

As to the medical bills, the special master found that Mother owed Father $498.73 for her share of medical bills incurred on behalf of Child, and Father owed Mother $137.76 for his share. Thus, the special master granted Father a judgment against Mother in the amount of $360.97 for her share of medical bills incurred by Father on Child's behalf.

The special master also instructed that Father should continue to provide health insurance for Child. The special master noted that she was "not convinced changing the obligation on to the Mother would create a savings for the parents or be in the best interest of the child."

Finally, because neither party submitted any proof as to the amount of attorney fees incurred, the special master stipulated that each party would be responsible for his/her own attorney fees and would equally divide any remaining court costs.

On October 27, 2008, the Chancery Court for Robertson County entered an order implicitly adopting the findings and recommendations of the special master. Mother's income was set at $2,662.73 per month for the purpose of child support calculations, and

Father's was set at $13,307.55 per month. Father's child support obligation remained at $1,000.00 since there was no 15% variance in income. Father was awarded a judgment of $360.97 for his share of Child's medical bills and was ordered to continue to provide health insurance for Child.

<u>Mother's Objections to the First Set of Findings and Recommendations</u>

On October 31, 2008, Mother filed a motion objecting to the findings and recommendations of the special master, asserting that the findings were contrary to the evidence.

In her objections, Mother first asserted that the special master considered evidence outside the record. Mother specifically objected to the special master's reliance on Mother's 2005 tax return in her findings and recommendations when that return was not one of the fifteen exhibits introduced into evidence at trial. Mother noted that the special master explicitly instructed the parties to make exhibits of anything they wanted to become a part of the record. Mother pointed to a conversation her attorney, Laurie Doty, had with the special master during direct examination of Father at the September 22, 2008 trial:

Q: . . . And did you take Mary as a deduction in 2006?

A: I'd have to look at the tax return.

[FATHER'S ATTORNEY]: Your Honor, we provided all these tax returns twice to Counsel and to the Court. If you'd like me to get those out and have my client review them, I'd be happy to do that.
. . .

THE COURT: I have the income tax returns up here on the bench. I can look at them and see when Mary was taken as a deduction. So I've got that information.

MS. DOTY: Are the documents that we've provided before going to be exhibits, or do I need to actually make them exhibits as we go?

THE COURT: *If you want it to be in the record, then I would make it an exhibit.*

MS. DOTY: Okay.

(Emphasis added).

In her objections to the special master's findings, Mother also insisted that the special master erred by imputing income to Mother. First, Mother argued that instead of using the criteria set forth by the Child Support Guidelines under Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(2)(ii)(II) for the imputation of income, the special master used Mother's 2005 tax return, which was not introduced into evidence. Second, Mother insisted it was error for the special master "to extrapolate a figure from [Mother's] 2006 income tax return that is neither explained in the Findings and Recommendations nor discernable from an examination of the exhibit itself." Finally, Mother asserted that the special master erred by imputing income to her.[3]

Next, Mother claimed that the special master's conclusion regarding the amount of money that Mother owed Father for his share of Child's medical bills was based on information that was not introduced at trial.

Mother also objected to the special master's refusal to change Child's health insurance provider to Mother's provider. According to Mother, co-pays through her provider "would mean less out-of-pocket expenses for both parties." Mother claimed that Father's testimony at trial indicated his willingness to switch Child's insurance to Mother's plan.

Finally, Mother argued that the special master's findings as to Father's income were contrary to the evidence. Mother claimed that Father never presented proof of his 2005 income at trial and asserted that the special master's findings regarding Father's 2006 and 2007 income were also contrary to the evidence.

Chancery Court Order and Interim Findings and Recommendations of the Special Master

On November 25, 2008, the chancery court issued an order remanding this matter to the special master to consider (1) the evidence contained in the subpoena served on Father on September 18, 2008, and (2) "[a]ny additional documents which should be entered into evidence to be considered by the Special Master in her Findings & Recommendations

---

[3] As previously noted, the provision cited by the special master, Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(3)(iv)(I), does not exist in the Child Support Guidelines. In her objections, Mother claims that the provision cited by the special master addresses instances in which there is no reliable evidence of income. Thus, it seems that in her objections, Mother was referring to the correct section of the Child Support Guidelines, Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(2)(iv)(I).

including but not limited to [Mother's] 2005 Tax Return." A rehearing before the special master was held on February 23, 2009. The special master's interim findings and recommendations were filed on March 4, 2009.

In her interim findings, the special master instructed Father to provide a copy of his 2005 financial statement to Mother's attorney if such a statement existed. The special master also noted that she "received into evidence the Mother's 2005 income tax return." The special master stated that she would consider Father's financial statements along with Mother's 2005 income tax return and then submit a second set of findings and recommendations.

### The Second Set of Findings and Recommendations of the Special Master

The special master submitted a second set of findings and recommendations on March 20, 2009. The special master noted that Father had provided handwritten financial statements for 2006, 2007, and 2008, which she had reviewed. The special master stated in her findings that Father could not recall if he had done a financial statement for 2005, but he stated that he would provide this to Mother's attorney if one existed. The special master then concluded that "nothing in the Father's financial statements to his bank contradicts the Special Master's finding as to his income." The special master reaffirmed her previous finding that Father's monthly gross income was $13,307.55.

The special master stated that she had "reviewed" Mother's 2005 income tax return, which was entered into evidence at the February 23, 2009 rehearing, and reaffirmed her earlier findings regarding Mother's 2005 income, including that, for child support purposes, Mother had annual income of $31,678.00 and monthly income of $2,639.83. The special master reaffirmed her finding that Mother was voluntarily unemployed or underemployed.

### Mother's Objections to the Second Set of Findings and Recommendations

Mother filed her objections to the second set of findings and recommendations of the special master on April 13, 2009, asserting that they were "contrary to evidence."

Mother again insisted that the special master's imputation of income to Mother was contrary to the evidence. First, Mother repeated her objection to the special master's finding regarding her 2005 income. According to Mother, instead of allocating additional income as described in Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(2)(ii)(II), the special master relied on "a tax return which was not introduced into evidence until the remand hearing on February 23, 2009." Mother also objected to the special master's assignment of annual income of $31,687.00 in 2005 when her tax return shows that she had no taxable income.

Additionally, Mother claimed that it was error for the special master to consider 2005 income that was two years prior to the filing of the petition on January 16, 2007, and one year after the parties' divorce in 2004. Second, Mother again objected to the special master's assignment of $37,533.00 of income in 2006 when the tax return showed that she had no taxable income. Third, Mother again claimed that the special master erred by imputing income to her.[4]

Mother also repeated her objections to the special master's finding regarding the amount of money that she owed Father for Child's medical bills and the special master's refusal to change Child's health insurance provider to Mother's provider.

Finally, Mother again objected to the special master's findings as to Father's income. First, Mother claimed that evidence of Father's 2005 income was not introduced at trial or at the February 23, 2009 rehearing. Additionally, Mother claimed it was error for the special master to consider 2005 income that was two years prior to the filing of her petition in 2007 and one year after the parties' divorce in 2004. Mother also repeated her objections to the special master's findings regarding Father's 2006 and 2007 income.

Trial Court Ruling

In an ordered filed May 11, 2009, the chancery court denied Mother's motion on objections. On August 19, 2009, this court entered a per curiam order finding that a final judgment, which was necessary in order for the appeal to proceed, had not been entered in this matter. On September 14, 2009, the chancery court issued a final order denying Mother's motion on objections to the second set of findings and recommendations of the special master, adopting the special master's second set of findings and recommendations, and adopting the special master's original findings and recommendations to the extent not inconsistent with the second set of findings and recommendations. Mother filed this appeal.

STANDARD OF REVIEW

Courts are required to use child support guidelines developed by the Tennessee Department of Human Services "to promote both efficient child support proceedings and dependable, consistent child support awards." *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 249 (Tenn. Ct. App. 2000); *see also* Tenn. Code Ann. § 36-5-101(e). Trial courts are to apply the child support guidelines as a rebuttable presumption in determining the amount of child support for any minor child. Tenn. Comp. R. & Regs. § 1240-2-4-.01(1)(d)(1). If

---

[4] As discussed, the special master cited Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(3)(iv)(I), apparently intending Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(2)(iv)(I).

the court finds the evidence sufficient to rebut that presumption, the court may order an amount of support different from the presumptive child support. Tenn. Comp. R. & Regs. § 1240-2-4-.07(1)(b). The amount or method of such deviation is within the discretion of the court. *Id.* However, the court's order must contain written findings of fact stating the reasons for the deviation from the presumptive amount of child support that would have been paid pursuant to the guidelines, the amount of child support that would have been required under the guidelines if the presumptive amount had not been rebutted, how application of the guidelines would be unjust or inappropriate, and how the best interests of the child will be served by deviation from the presumptive guideline amount. Tenn. Comp. R. & Regs. § 1240-2-4-.07(1)(c).

The standard of review in situations involving the findings of a special master is set forth in Tenn. Code Ann. § 27-1-113: "Where there has been a concurrent finding of the master and chancellor, which under the principles now obtaining is binding on the appellate courts, the court of appeals shall not have the right to disturb such finding." This proposition is more fully explained by our case law:

> The trial court's order referring certain matters to the Special Master, the Special Master's report, and the trial court's order on the report affect our standard of review on appeal. *See Manis v. Manis*, 49 S.W.3d 295, 301 (Tenn. Ct. App. 2001); *Archer v. Archer*, 907 S.W.2d 412, 415 (Tenn. Ct. App. 1995). Generally, concurrent findings of fact by a special master and a trial court are conclusive and cannot be overturned on appeal. *Manis*, 49 S.W.3d at 301. However, a concurrent finding is not conclusive where it is upon an issue not properly referred to a special master, where it is based upon an error of law or a mixed question of fact and law, or where it is not supported by any material evidence. *Id.*

*Pruett v. Pruett*, No. E2007-00349-COA-R3-CV, 2008 WL 182236, at *4 (Tenn. Ct. App. Jan. 22, 2008) (quoting *Dalton v. Dalton*, No. W2006-00118-COA-R3-CV, 2006 WL 3804415, at *3 (Tenn. Ct. App. Dec. 28, 2006)). The standard of review to apply in such cases is similar to the standard applied when reviewing a jury verdict; "we must affirm if there is any material evidence to support the trial court's concurrence." *In re Estate of Ladd*, 247 S.W.3d 628, 636-37 (Tenn. Ct. App. 2007) (citing *Coates v. Thompson*, 713 S.W.2d 83, 84 (Tenn. Ct. App. 1986); Tenn. R. App. P. 13(d)). This heightened standard of review applies only to findings that are made by both the special master and the chancery court. *Id.* at 637.

When the findings of the special master and the trial court are not concurrent, the standard of review of a trial court's findings of fact is de novo with a presumption of

correctness unless the preponderance of the evidence is otherwise. *Id.*; Tenn. R. App. P. 13(d). We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

ANALYSIS

On appeal, Mother asserts that the trial court erred in adopting the findings and recommendations of the special master. Mother claims that the special master considered evidence outside the record, which resulted in errors in the findings that Mother was voluntarily underemployed, that Mother owes Father $498.73 for her share of Child's medical bills, that Child should remain on Father's health insurance policy, and in the determination of Father's income in 2005, 2006, and 2007.

Father's Income/Modification of Father's Child Support

In considering a petition to modify child support, the trial court must determine whether there is a significant variance between the obligor's current obligation and that set by the guidelines. *See* Tenn. Code Ann. § 36-5-101(g); *Kaplan v. Bugalla*, 188 S.W.3d 632, 636 (Tenn. 2006). The parent seeking to modify a child support obligation has the burden of proving that a significant variance exists. *Wine v. Wine*, 245 S.W.3d 389, 394 (Tenn. Ct. App. 2007).

The permanency plan entered into between the parties set Father's child support at $1,000.00 per month. Mother petitioned the court for an increase in Father's child support, claiming that there existed a 15% variance in his income. Based on the Child Support Worksheet, the special master found that Father's "presumptive child support order" was $899.00 per month. The special master concluded, therefore, that a 15% variance did not exist and Father's child support would remain at $1,000.00 per month.[5]

The special master listed Father's "monthly gross income" as $13,307.55 on the Child Support Worksheet that she used to calculate Father's presumptive child support. The special master's first set of findings and recommendations states that she arrived at this figure by averaging Father's income from 2005 to 2008. Mother claims that the special master erred by considering Father's 2005 income when there was no proof of his 2005 income presented. Mother also claims that the special master's findings for Father's 2006 and 2007 income are contrary to the evidence.

---

[5] Tenn. Comp. R. & Regs. § 1240-2-4-.05(2)(c) of the Child Support Guidelines defines a significant variance as at least a 15% difference between the amount of the current support order and the amount of the proposed presumptive support order.

First, Mother is correct that evidence of Father's 2005 income was not introduced at trial or at the subsequent February 23, 2009 rehearing. After Mother objected to the special master's original findings and recommendations, the special master instructed Father in her interim findings to provide a 2005 financial statement. Father did not provide such a statement prior to the rehearing. The rehearing transcript indicates that the special master instructed Father to check with his bank and, if he had any 2005 financial statements, to give them to Mother's attorney following the proceeding. The special master's second set of findings, following the rehearing, reflects as much:

> At [the time of the February 23, 2009 rehearing], the Father was required to provide financial statements requested by the Mother for 2005, 2006, 2007 and 2008. The Father did provide the handwritten financial statements for 2006, 2007 and 2008. The Father stated that he could not recall if he had done a financial statement for 2005 but stated he would provide this to the attorney for the Mother if one existed. The Mother's attorney was then allowed to question the Father as to his financial statements.

The special master also stated in the second set of findings that she had "reviewed the income information from the Father's financial statements to his bank in 2006, 2007 and 2008" and that nothing in those statements contradicted her earlier findings as to Father's income.

From these statements, it is clear that Father did not present proof of his income for 2005, contrary to his assertion. Father does not state what form this alleged proof took, but there is no 2005 tax return for him in the record. As such, it is unclear how the special master arrived at her conclusion that Father had income of $137,887.00 in 2005 in her original findings and recommendations, which she reaffirmed in her second set of findings and recommendations.

Mother also claims that the special master's findings for Father's 2006 and 2007 income are contrary to the evidence. In her original findings, the special master determined that Father had income of "at least" $181,162.58 in 2006 and "at least" $197,827.00 in 2007. However, Father's income tax returns reflected adjusted gross income of $162,988.00 in 2006 and $181,131.00 in 2007. The special master also noted that "Father did admit that his 2007 income tax return and his 2006 return might not reflect all of the income from his rental properties." It is again unclear what evidence the special master relied upon in reaching the amount of income she assigned to Father in 2006 and 2007.

Based on the lack of support for the special master's determination of Father's income in 2005, 2006, and 2007, we conclude that there is not material evidence to support the trial court's adoption of the special master's finding that a 15% variance in Father's income did

-11-

not exist. We remand this issue to the trial court for a redetermination of Father's income and presumptive child support to determine whether a 15% variance exists.

## Mother's Underemployment

In response to Mother's assertion that Father had a 15% variance in his income, Father claimed that Mother was purposefully underemployed. In her first set of findings and recommendations, the special master concluded that Mother was "willfully and/or voluntarily underemployed" under Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(2)(ii). In reaching this conclusion, the special master relied in part on Mother's 2005 income tax return. Mother claims that this was error because her 2005 tax return was not entered into evidence until the February 23, 2009 rehearing, following the special master's first set of findings.

Mother is correct that there is no 2005 tax return in the record from the September 22, 2008 hearing. Mother's 2005 tax return was only entered into evidence after she objected to the special master's first set of findings and recommendations and the trial court remanded the matter to the special master to consider any additional documents that should be considered by the special master, " including but not limited to [Mother's] 2005 Tax Return."

In her second set of findings and recommendations, the special master noted only that she had "reviewed" Mother's 2005 income tax return and reaffirmed her earlier findings that Mother's annual income for 2005 was $31,678.00, for a monthly gross income of $2,639.83. The special master did not explain how she arrived at this amount in her original findings when Mother's 2005 tax return had not been submitted into evidence at that time. Furthermore, Mother's 2005 tax return reflects an adjusted gross income of -$6,012.00. Evidently the special master imputed income to Mother based on her conclusion that Mother was willfully and/or voluntarily underemployed. It is unclear, however, how the special master arrived at the $31,678.00 figure.

The special master also attributed income of $37,533.00 to Mother for 2006, despite a tax return that reflects adjusted gross income of -$31,738.00. In explanation of her calculation, the special master offered only that she had "examin[ed] the income and expenses of both the flower shop and video shop as reflected on [Mother's] 2006 income tax return." Again, we are unable to see how the special master arrived at these figures based on the evidence submitted.

Under the Child Support Guidelines, imputing additional gross income to a parent is appropriate if the parent is found to be willfully and/or voluntarily underemployed or unemployed. Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(2)(i)(I). "The purpose of the determination [of willful and/or voluntary underemployment or unemployment] is to

ascertain the reasons for the parent's occupational choices, and to assess the reasonableness of these choices in light of the parent's obligation to support his or her child(ren) and to determine whether such choices benefit the children." Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(2)(ii). "A determination of willful and/or voluntary underemployment or unemployment is not limited to choices motivated by an intent to avoid or reduce the payment of child support. The determination may be based on any intentional choice or act that adversely affects a parent's income." Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(2)(ii)(I). The Child Support Guidelines do not presume that any parent is willfully and/or voluntarily underemployed or unemployed; the burden of proof is on the party alleging that a parent is willfully or voluntarily underemployed or unemployed. Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(2)(ii); *Owensby v. Davis*, No. M2007-01262-COA-R3-JV, 2008 WL 3069777, at *4 (Tenn. Ct. App. July 31, 2008).

There are a number of factors that a court may consider when making a determination of willful and voluntary underemployment. Those applicable in the present case include the following:

(I)   The parent's past and present employment;
(II)  The parent's education, training, and ability to work;
. . .
(IV) A parent's extravagant lifestyle, including ownership of valuable assets and resources (such as an expensive home or automobile), that appears inappropriate or unreasonable for the income claimed by the parent;
. . .
(VI) Whether unemployment or underemployment for the purpose of pursuing additional training or education is reasonable in light of the parent's obligation to support his/her children and, to this end, whether the training or education will ultimately benefit the child in the case immediately under consideration by increasing the parent's level of support for that child in the future;
(VII) Any additional factors deemed relevant to the particular circumstances of the case.

Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(2)(iii). Once a parent is found to be willfully and/or voluntarily underemployed, additional income can be allocated to increase the parent's gross income "to an amount which reflects the parent's income potential or earning capacity." Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(2)(ii)(II). In determining that amount, courts are to use the following criteria: the parent's past and present employment and the parent's education and training. *Id.*

The special master concluded that Mother was willfully and/or voluntarily underemployed under the Child Support Guidelines, "specifically § 1240-2-4-.04(3)(a)(2)(ii)." The special master determined that it was not "reasonable for the Mother to continue as a contractor given the poor residential home sales market, the failure of the Mother's side businesses and the fact that the Mother has reported a negative income to the IRS for the last three (3) tax years." The special master was critical of Mother's decision not to seek other work when her side businesses had failed and construction sales were weak.

In order to ascertain whether Mother was willfully and/or voluntarily underemployed, we must consider her employment history, as well as her education, training, and ability to work. *See* Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(iii). Mother has a bachelor's degree from the University of Michigan in anthropology, although she testified that the degree was "[n]ot at all" useful for obtaining employment. She was a mortgage loan officer from 1990 to 1997, and she earned "a minimum of $30,000 a year at that time." Mother testified that she did not think returning to employment as a loan officer would be profitable "[b]ecause people aren't getting mortgages right now."

Following her career as a loan officer, Mother began helping Father in the construction business. Mother has a contractor's license and has "built" some homes. At the time of the September 22, 2008 hearing, Mother had five homes for sale. Mother described her involvement in the construction business:

> I secure financing. I choose locations. I get permits. I set up subcontractors, when and where they're supposed to do their stuff. I oversee the job, make sure everything is being done properly and in the right order. I make sure that's done on time, what they have to do in order to get another sub in there. I need to inspect the houses every day while the work is going on.
>
> As far as actual work, I do the mowing, the landscaping, the painting, the tile work, put on door knobs, locks. I deal with all of the contractors and supply the building materials. I deal with the real estate agent. That's it.

Mother started a flower shop while the parties were married. Mother purchased the property for the shop in the spring of 2002 and opened it in September 2002, before the parties were divorced. The flower shop was not successful. Mother laid off all of her employees and was the only person working at the shop. At the time of the September 22, 2008 hearing, Mother testified that the flower shop property had been for sale for almost a year. While she had not received any offers, there had been "some interest." The property was listed for sale for $512,000; Mother testified that she owed $264,000 on the property.

-14-

Because the flower shop was unsuccessful, Mother tried "to find a way to cut the overhead expense and divide it between something else." She opened a video store, which was also unsuccessful. Mother testified, "Well, the video business is not a good business to be in right now because there's so many other options for people. You can rent off the satellite. You can rent off the cable. You can rent from NetFlix. And you can go to McDonald's and rent them for a dollar." Mother stated that opening the video store only "made things worse." Mother closed the video store and was in the process of selling off the assets at the time of the hearing.

Mother's tax returns for 2005 and 2006 reflect adjusted gross income of -$6,012 and -$31,738, respectively. Mother acknowledged at trial that all of the losses showing on her financial statements "really are losses through the flower shop and the video store." Her 2007 projected tax return showed projected net profit of $12,116 from the flower shop and projected net loss of $31,379 from the video store.[6]

Mother stated at trial that she was not seeking other employment because she did not "have the time to do that and finish these houses and keep from going bankrupt." Mother testified that if she got a job making minimum wage, she would bring home "less than $200" each week, which would not meet her expenses.

In addition to the flower shop and video store property, Mother acknowledged that she had six rental properties listed on her projected tax return for 2007. Mother further testified that the house in which she resided at the time of the hearing was for sale for $235,000; Mother owed $150,000 on the home.

A parent's lifestyle is also relevant to the underemployment determination. Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(iii)(IV). When asked to describe her lifestyle, Mother testified, "I work and take care of my home. I take care of my child when I have her, and that's it." Mother stated, "I get to go on a rare vacation when I get to use my brother's condo for free in Florida." Mother later acknowledged having traveled to Florida four times and Las Vegas three times since the divorce in 2004. Mother testified that she did not own any vacation property, did not dine out frequently, and did not go on shopping sprees. She owned one vehicle, a 2007 Toyota Tundra, which she used for work.

Upon review of the entire record and application of the factors set forth in Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(2)(iii), we agree with the special master that Mother was willfully and/or voluntarily underemployed. Mother focused her efforts on extremely unsuccessful businesses despite having training and experience in other fields. Mother

---

[6] Mother testified that she lacked the money to pay an accountant to complete her 2007 tax return.

testified that she had not sought other employment and that a minimum wage job would still not cover her expenses. This is an unacceptable excuse when Mother was already earning negative income.

In light of the foregoing, we conclude that there is material evidence to support the trial court's adoption of the special master's determination that Mother was willfully or voluntarily underemployed. However, the amount of income that the special master apparently imputed to Mother was not explained and lacks proper evidentiary support. We remand this issue to the trial court for a redetermination of Mother's income under the appropriate standard set forth in Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(2)(ii).

Medical Bills

The special master found that Mother owed Father $498.73 for her share of medical bills incurred on behalf of Child and that Father owed Mother $137.76 for his share of medical bills incurred on behalf of Child. Mother insists that this finding is contrary to the evidence presented at trial. Mother is correct that the only evidence presented at trial as to medical bills paid by Father was his testimony on direct examination:

> Q: And the back medical bills—you have also paid back medical bills for your daughter, correct?
>
> A: Yes.
>
> Q: And so about $500 that we submitted details the billing on that.
>
> A: Sounds right.

There are no exhibits in the record reflecting Father's expenditures for Child's medical bills. The special master did not explain how she arrived at $498.73 when the only proof submitted is that Father spent "about $500." We therefore conclude that there is not material evidence to support the trial court's adoption of the special master's finding that Father owes Mother $498.73 for Child's medical bills.

Father insists that even if the special master improperly relied on out-of-court documents to reach the $498.73 figure, the finding should be affirmed because Mother suffered no harm from that reliance. While we agree that the $1.27 difference is nominal, it is symptomatic of the greater problem that the special master appears to have consistently relied on evidence outside the record and/or failed to explain her calculations. Our concern is that the special master may have omitted or relied on other evidence that could make a

more significant difference in the calculation of medical bills and the final amount owed by the parties. In fact, we are also unable to find evidence in the record to support the special master's determination that Father owed Mother $137.76 for his share of Child's medical bills. Because we cannot ascertain how the special master arrived at these figures, we believe a redetermination of the expenses incurred on behalf of Child is in order.

<u>Health Insurance</u>

Child has been covered under Father's health insurance policy since the parties' divorce. At trial, Mother sought to have Child's coverage changed to her own policy because the monthly premiums and deductible were both lower than on Father's policy. Mother asserts that Father agreed to this proposition at trial with the following testimony:

Q: And your plan would be for the judge to order that—you have had the insurance all this time.

A: Yes.

Q: And you know that she's asking to add her on at approximately $80.

A: Yes.
. . . .

Q: You don't care if she adds the child. You just don't want to have to drop your insurance. Is that what you're telling me?

A: That's correct. I don't want her to be (inaudible) $80. I can deal with that. I would still like to keep my policy because it has a million dollar cap on it so if something major happens, I don't have to worry about a cut off of coverage. Potentially, 500,000 (indistinct) reach 500. But if she wants to carry it, I'll be happy to pay her that portion of it. I don't mind—

Q: You want to keep your—

A: I just want to keep mine, but I will happily pay her part.

Mother challenges the special master's recommendation that Father continue to provide coverage when his testimony indicates his willingness for Mother to provide the coverage.

Mother's argument, however, mischaracterizes Father's testimony and disregards other portions of his testimony in which he makes clear that he would like to continue to be the parent responsible for Child's health insurance coverage. Father explained at trial that he objected to Mother providing Child's coverage because of his concern over her financial instability, so much so that he intended to continue to provide coverage for Child regardless of the special master's recommendation:

Q: Now, you heard me say that the reason was because you don't feel that she's as stable as you are with regard to the medical insurance. You heard me say that.

A: Yes.

Q: Do you feel that she has some issues going on right now with money that might make it difficult for her to even pay her bill? Is that what you're saying?

A: She can't pay her accountant's bill, yes. And I hate that that's where at [sic], but the medical insurance is so important. I would like to think that she would never let a lapse happen. But, you know, if you get—if you're behind on money, it could potentially happen. You know, hopefully it wouldn't, but in that I'm willing to pay the extra 80-something dollars.

Q: So basically, you just want—you're going to cover the insurance whether the judge lets you put that in the box [on the child support worksheet] or not.

A: Correct.

Q: All right. And what you'd like the judge to do is let hers be in the box, $80 and some cents, and yours be in the box, which is just about the same amount, correct? Is that what you're asking for?

A: Yes.

Father maintains that throughout these proceedings, his position has been that he should remain the party responsible for Child's health insurance coverage. Given Father's testimony, we find that there is material evidence supporting the special master's conclusion that Father should continue to provide Child's health insurance coverage. The trial court's decision regarding Child's health insurance coverage is affirmed.

-18-

CONCLUSION

We vacate the trial court's decisions regarding Father's income and child support obligation and remand those matters for redetermination.  We affirm the trial court's finding that Mother is underemployed and remand the matter to the trial court for a calculation of imputed income.  We also vacate the trial court's calculation and division of medical bills and remand the matter for reexamination, recalculation and redivison.  Costs of appeal are assessed against the appellee, for which execution may issue if necessary.


_____
ANDY D. BENNETT, JUDGE