FILED

06/18/2026

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 9, 2026 Session

**MARLA ANN RICHARDSON v. DIANNE M. MOORE**

**Appeal from the Chancery Court for Houston County**
**No. 42CHI-2019-CV-749  Larry J. Wallace, Judge**

_____

**No. M2025-00135-COA-R3-CV**

_____

A property owner brought suit against the owner of a neighboring property, seeking either an order awarding her land encompassing a driveway or an easement to use the driveway. The trial court referred the issues to a special master, who made detailed findings regarding the boundary between the properties and as to the elements necessary to establish a prescriptive easement and an easement by necessity. Following a hearing on objections to the special master's report, the trial court accepted the special master's findings and recommendations. The neighbor appealed, raising issues regarding the court's weighing of the evidence in finding the boundary line and granting of a prescriptive easement and an easement by necessity. We affirm.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., C.J., and W. NEAL MCBRAYER, J., joined.

Dianne M. Moore, Erin, Tennessee, pro se.

Gregory D. Smith, Clarksville, Tennessee, for the appellee, Marla Richardson.

**OPINION**

I.

Since 1975, Marla Ann Richardson has lived at 5153 East Main Street, Erin, Tennessee. In 2014, Dianne Moore purchased an adjacent property, 5155 East Main Street. Both properties connect to East Main Street via a Y-shaped driveway. Ms. Richardson, who referred to the driveway as "a common driveway," and her family use the driveway

to access Ms. Richardson's property both for personal vehicles and commercial equipment. Ms. Moore, who was living in a different state when she bought the adjacent property, did not know that the driveway was being used in this manner. After moving onto her property, Ms. Moore began making changes to the land around the driveway.

Conflict arose as to the use of the driveway and that conflict has escalated over the years. The parties' disagreement over the use of the driveway eventually culminated in Ms. Richardson filing suit against Ms. Moore. In her complaint, Ms. Richardson alleged that Ms. Moore had destroyed trees and fencing on Ms. Richardson's property, placed rock and debris on Ms. Richardson's property, and interfered with an easement Ms. Richardson held for use of the driveway. She sought damages for the removal of the trees as well as an order designating the boundaries between the two properties and granting her "either ownership of the property encompassing the driveway or an easement for same." Ms. Moore denied that she had removed or placed any items on Ms. Richardson's property and argued that there was no recorded documentation of the alleged easement. She complained that the Richardsons were "constantly leaving messes in [her] yard and drive," including trees and garbage that slid down their hillside onto Ms. Moore's land and gravel that fell out of the equipment they drove on the driveway. Ms. Moore requested that the court designate "a more appropriate" boundary line between the properties than the hillside atop which Ms. Richardson's property sat. She also asked the court to deny Ms. Richardson ownership of or an easement to use the driveway. In the alternative, if the court were to grant an easement, Ms. Moore asked that the easement be "restricted to residential cars and pickup trucks," that Ms. Richardson "be required to pay a reasonable yearly fee" to Ms. Moore for maintaining the driveway, that Ms. Richardson not alter the driveway without coming to a signed agreement with Ms. Moore, and that Ms. Richardson be solely responsible for maintaining the culvert between the properties.

The trial court referred the case to a special master, who heard testimony from Ms. Moore, Ms. Richardson, Ms. Richardson's adult son, the county sheriff, a local police chief, and a surveyor hired by Ms. Richardson.

Ms. Moore testified that when she initially moved onto her property, she had orally given Ms. Richardson and her son permission to use the driveway. However, when she learned that the son was driving commercial equipment on the driveway, she "had an issue" with his doing so. According to Ms. Moore, both properties were zoned residential, so she had not expected commercial equipment to be used on the driveway, and the commercial vehicles were causing damage to her yard. She therefore "took [her] permission away" as to Ms. Richardson's son "and his vehicles that don't respect [her] yard."

Ms. Richardson's son, who was part of the city zoning board, testified that his mother and father had been operating a farm on the Richardson property since 1976 or 1977, and that he had joined them in the venture in 1984. According to his testimony, the city created zoning ordinances in 1988, classifying properties as either "residential" or

"commercial." However, he continued to explain that several tracts, including the Richardson property, were "grandfathered in as agriculture,"[1] so he had continued to do agricultural work on the property. He stated that he had kept his commercial equipment in a garage on Ms. Richardson's property since 1984.

Ms. Richardson testified that the driveway at issue had been in the same place since she and her husband purchased the property and that they had used it since that time. She stated that, initially, the driveway "went around a box elder tree" and a "little narrow bridge." When the Richardsons started farming their land, their commercial equipment "couldn't go around the little tiny bridge," so they modified the driveway. They "had a culvert put in and widened [it]" so that they "didn't have to go around that tree and that little narrow bridge." In order to put in the culvert, they also had some trees "cut [down] at the drive." Thereafter, the equipment the Richardsons stored on their property, including a tractor, dump trucks, and other large vehicles, used "the new bridge [Mr. Richardson] put in [and] the new culvert." The Richardsons had "always kept the driveway up," and "always" fixed damage caused to the end of the driveway by rain flowing downhill. Ms. Richardson also testified that the Richardsons built a fence and maintained the trees that Ms. Moore later removed.

Ms. Moore testified that "all [she] knew" when she purchased her property was that "the driveway was on [her] property" and "it was a residential . . . property that lived over there" adjacent to her land. She did not "have an issue with residential [vehicle] use" of the driveway, but she "ha[d] an issue with commercial use and them . . . driving on [her] yard and not in the driveway." She also had "issues with Ms. Richardson driving her lawnmower" "down by the front yard where the 'Y'[-shaped driveway] comes into." She submitted photographs depicting Ms. Richardson "bring[ing] her equipment down to the driveway" to mow the area, complaining that this was a "continuing" problem that caused rocks to fly dangerously out of the lawnmower "at outrageous speeds." She had, at various times, placed "boundary markers" including river rock and cinder blocks along the driveway, and she had put up a "no trespassing" sign. She wanted the Richardsons "to build their own driveway."

Ms. Moore submitted several photographs she had taken of the land as evidence of what she believed to be the boundary between the properties. Ms. Richardson, alternatively, had a licensed surveyor testify regarding a survey of the boundary between the properties that he had performed in 2016. The surveyor described in detail his methodology and steps in determining the boundary. Although he began by looking at the deeds to both properties and locating the markers called for in both, he did not assume that

_____

[1] During the proceedings before the special master, Ms. Moore questioned Ms. Richardson's son about whether the agricultural use of the Richardson property violated city zoning rules. The special master advised Ms. Moore that she would have to take that issue up at a zoning board hearing rather than as a part of the proceedings at bar.

prior surveyors' measurements were correct. He testified that there were several methods he could use to measure the boundary, and he chose to use the "distances" method based on the grade of the land. The surveyor concluded that the stumps marking the trees Ms. Moore had removed were on the Richardson property but that there was not enough of the disputed fencing left for the surveyor to be able to make any conclusion about where the fence had been located. Ms. Richardson's son testified to his estimate that the "eight or nine" trees Ms. Moore had cut down were worth, "depending on what size they [were], $800 to $1,000 per" tree. Ms. Moore, however, insisted that the surveyor was wrong and that the trees and fences were definitively on her property. She claimed that she had also had a survey done, though her surveyor was not present to testify. She stated that her own surveyor had also incorrectly determined the boundary line.

The county sheriff and the police chief, who had each lived in the area for several decades, both testified that the Y-shaped driveway had, to their knowledge, "always" served as the entrance and exit to the Richardson residence and their business. At age 58 and having been raised in the area, the sheriff "never knew it to be any different." He stated that when Mr. Richardson was alive, Mr. Richardson had "run construction . . . out in the area and that's the way [the sheriff] remembered it for most of [his] life." He testified that, since Ms. Moore had moved in, the police had been called to the properties on numerous occasions for incidents such as Ms. Moore barricading the path to the Richardson property or following Ms. Richardson's son. He also pointed out that, in pictures of the driveway, the path up the hill to the Richardson property appeared more "well-beaten" than the path to Ms. Moore's property. The police chief, who had lived in the city for 48 years, also recalled being called out to the properties for an incident in which Ms. Moore barricaded the driveway when Ms. Richardson was trying to use the driveway to leave. The driveway was, "to [his] knowledge," the only ingress and egress to the Richardson property, including the farm. The Richardsons had been using the driveway for 'as long as [he] c[ould] recall," and he was concerned that blocking the driveway could be dangerous if it prevented people from being able to access the Richardson property in the case of an emergency.

Ms. Richardson's son testified that his uncle had originally owned both Ms. Richardson's and Ms. Moore's properties. The uncle had sold Ms. Richardson's property to Ms. Richardson and her husband. The uncle also gave Ms. Moore's land to his daughter. After the daughter, "an older guy . . . moved in," and then "he passed away and then it was sold again." The man who bought the property then "lost it to the bank," and Ms. Moore eventually moved in. Ms. Richardson's son testified that, through all of the various changes in ownership, he had "always" driven commercial equipment on the driveway to reach his mother's property. He and his family had maintained the fence and tree row by the driveway until Ms. Moore removed them. He had continued to attempt to maintain the driveway area after Ms. Moore moved in, putting in gravel "to fill up the ditches and the gullies" when rain washed out parts of the driveway, as he stated that he had done for more than 40 years, but Ms. Moore "shoveled it out." He had "always fixed the driveway . . .

- 4 -

for everybody that lived there," but Ms. Moore "would not let [him] fix the driveway" anymore.

According to Ms. Richardon's son, there was no other place for ingress and egress to the Richardson property aside from the driveway at issue. There existed "a skidder road, old logging road" at the backside of the property, but four-wheelers and other vehicles had flipped over in attempts to go up the hill to the Richardson property from there. He could "get through there with a dozer," which would "barely . . . go through there," but nothing else. His wife had "turned a side-by-side trying to get up there." He believed that the terrain was too steep to put in a driveway and that rocks would have to be blown out. In his opinion, this would cost several hundred thousand dollars, which was cost-prohibitive for his mother. By comparison, the driveway at issue had "been there since 1860," and it was the only method of ingress and egress to the Richardson property that the family had used since purchasing the property in 1975; "there's been no other way" to get up the hill to their land based on how "that property sits there." The sheriff, too, testified that "the structure of the earth there is strictly bluff." In his opinion, another driveway could not be put in because the Richardson property was "at least 25 feet above a tall bluff."

Ms. Moore was dissatisfied with the testimony presented. She complained that Ms. Richardson had not "shown [her] any pictures or any documents that say [she] ha[s] an easement." She also complained that Ms. Richardson's son had not presented any documents to show that the Richardson family's businesses had made use of the property before it was zoned. She felt that witness testimony alone, without any supporting documentation, was "not real evidence." She also argued that, while "there would have been a prescriptive easement" for the Richardsons to use the driveway "with other people" who owned the driveway before her that they did not have a prescriptive easement after she became the owner. She also felt that the Richardsons could not "turn [her] permission" to use the driveway for residential vehicles "into a prescriptive easement" for commercial vehicles. She did not want the Richardsons maintaining the driveway anymore.

Following the hearing, the special master issued a detailed report in which he made numerous factual findings and recommended conclusions to be drawn from them. Among these, the special master found that the surveyor's explanation of his survey was "very detailed and credible" and that Ms. Moore had "failed to produce testimony from another surveyor that discredited [its] reliability." He concluded that the survey accurately set forth the boundary line between the properties. However, he concluded that Ms. Moore was not liable for damages for any removed trees or fencing, as the proof presented did not establish the amount of damages that was incurred, if any.

The special master also determined that Ms. Richardson had provided sufficient evidence of each of the necessary elements to establish both a prescriptive easement and an easement by necessity "to use the subject common driveway for ingress and egress to her property." Specifically, he found that the driveway had been used "for egress and

- 5 -

ingress to access her property for more than 40 years, of which Ms. Richardson used and continues to use said common driveway continuously, uninterrupted, openly, visibly, exclusively and with the knowledge and acquiescence of the owner of the adjoining property owner (the servient tenement)." The special master also found that, "[o]ther than the existing common driveway, there is no other reasonable way to access the [Richardson] property" and that "the backside terrain of [Ms. Richardson's] property has excessive rocks, and it is so steep that it would take thousands of dollars to get it ready" for a driveway.

Ms. Moore filed an objection to the special master's report in which she argued, among other things, that the special master "erred by basing judgment primarily on the Plaintiff[']s and Plaintiff[']s witnesses' testimony without corroborating documentary evidence." The transcript of the trial court's hearing on her objections is not contained in the appellate record. Following the hearing, the trial court entered an order based on its consideration of the "filed pleadings, evidence presented, arguments of counsel and the record as a whole." The trial court reached the following conclusion: "After careful consideration and a review of the files, the Court hereby overrules said objections and adopts verbatim the findings and recommendations and [sic] as set forth in the Special Master's report filed on September 9, 2024, and incorporates said report herein by reference and finds that it is fair and equitable."

Ms. Moore appealed. She raises three issues:

[I]. Whether the Trial Court erred changing the same boundary line described in both parties' deeds, to that of a description given by a surveyor hired in 2016, by Ms. Richardson which moved the boundary, without relying on the applicable laws related to deeds, boundary lines and surveys and relying on the Surveyors testimony and survey alone.

[II]. Whether the Trial Court misapplied the Preponderance of Evidence standard and erred when concluding Ms. Richardson satisfied her burden of proof to establish an easement by implication via necessity.

[III]. Whether the Trial Court misapplied the Clear and Convincing standard and erred when concluding Mrs. Richardson satisfied her burden of proof to establish a prescriptive easement which allows not just residential vehicles but semi-trucks, and trailers, dump trucks and other large equipment to use Ms. Moore's driveway.

Responding to Ms. Moore's challenges to the trial court's ruling, Ms. Richardson argues in support of the trial court's rulings with regard to each of the aforementioned issues. Additionally, Ms. Richardson asserts that Ms. Moore's appeal is frivolous and,

accordingly, that she is entitled to attorney's fees under Tennessee Code Annotated section 27-1-122.

## II.

Ms. Moore is proceeding pro se in this appeal. Pro se litigants "are entitled to fair and equal treatment by the courts." *Vandergriff v. ParkRidge E. Hosp.*, 482 S.W.3d 545, 551 (Tenn. Ct. App. 2015). Courts should be mindful that pro se litigants often lack legal training and may be unfamiliar with the justice system. *State v. Sprunger*, 458 S.W.3d 482, 491 (Tenn. 2015). Accordingly, courts should afford some degree of leeway in considering the briefing from a pro se litigant, *Young v. Barrow*, 130 S.W.3d 59, 63 (Tenn. Ct. App. 2003), and should consider the substance of the pro se litigant's filing. *Poursaied v. Tenn. Bd. of Nursing*, 643 S.W.3d 157, 165 (Tenn. Ct. App. 2021).

Pro se litigants may not, however, "shift the burden of litigating their case to the courts." *Whitaker v. Whirlpool Corp.*, 32 S.W.3d 222, 227 (Tenn. Ct. App. 2000). Additionally, "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her." *Sneed v. Bd. of Prof. Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010). In considering appeals from pro se litigants, the court cannot write the litigants' briefs for them, create arguments, or "dig through the record in an attempt to discover arguments or issues that [they] may have made had they been represented by counsel." *Murray v. Miracle*, 457 S.W.3d 399, 402 (Tenn. Ct. App. 2014). It is imperative that courts remain "mindful of the boundary between fairness to a pro se litigant and unfairness to the pro se litigant's adversary." *Hessmer v. Hessmer*, 138 S.W.3d 901, 903 (Tenn. Ct. App. 2003).

## III.

Ms. Moore argues on appeal that the trial court erred in adopting the special master's report regarding the boundary between the properties as well as finding a prescriptive easement and an easement by necessity. The Tennessee Supreme Court has indicated that

> [c]oncurrent findings of fact made by the chancellor and special master and supported by material evidence are binding upon the appellate court. Tenn. Code Ann. § 27-1-113 (2000). However, issues not proper to be referred, findings based on an error of law, mixed questions of fact and law, and findings unsupported by material evidence are not. *In re Estate of Ladd,* 247 S.W.3d 628, 636 (Tenn. Ct. App. 2007).

*Fayne v. Vincent*, 301 S.W.3d 162, 170 (Tenn. 2009); *Tennison Bros., Inc. v. Thomas*, 556 S.W.3d 697, 723 (Tenn. Ct. App. 2017) ("A concurrent finding of a special master and chancellor is conclusive on appeal, except where the finding is on an issue not properly

- 7 -

referred, where it is based on an error of law or a mixed question of fact and law, or where it is not supported by any material evidence.").

As this Court has noted,

A presumption of correctness does not attach to mixed questions of fact and law. Although a presumption of correctness attaches to the trial court's findings of fact, we are not bound by the trial court's determination as to the legal effect of its factual findings, nor by its determination of a mixed question of law and fact. Our standard of review of rulings on mixed questions of fact and law is de novo with a presumption of correctness extended only to the trial court's findings of fact.

*Knop v. Knop*, No. E2019-01035-COA-R3-CV, 2020 WL 2781737, at *3 (Tenn. Ct. App. May 29, 2020).

A.

Turning first to the boundary between the properties, Ms. Moore contends that it was error to base the determination of the line's location on the surveyor's testimony and report. She argues that the surveyor "ignored the intent of the deed description," resulting in an "invalid[]" survey that "changed" the boundary, and that Ms. Richardson provided no other documentary evidence regarding the boundary line.

Ms. Moore complains that the trial court's "foundational logic rested on the credibility of [the surveyor]." It is not the function of this court though to second-guess or reevaluate the trial court's credibility determinations. *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013) (explaining that "trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges.").

We give great weight to the concurrent finding that the surveyor's explanation of the survey was "very detailed and credible." *See In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007) ("In weighing the preponderance of the evidence, great weight is afforded to the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary."); *Boatman v. Odziana*, No. M2024-00677-COA-R3-CV, 2025 WL 2814800, at *8 (Tenn. Ct. App. Oct. 3, 2025). The record demonstrates that the surveyor explained that he began his survey by looking at the deeds but did not assume that any prior surveyors' measurements were correct. He took his own measurements and determined, based on the grade of the land, that using the "distances" method of surveying the boundary would provide the most accurate result. Ms. Moore, though she reported that she had also had the land surveyed, did not present the testimony of a competing surveyor to contradict the surveyor's testimony. Rather, Ms.

- 8 -

Moore argued that her own surveyor was also incorrect in determining the boundary line. She submitted photographs to demonstrate her personal belief regarding where the boundary line should be. The record supports the finding of the special master and the trial court as to the boundary; we affirm this finding.

B.

Ms. Moore also contends that the trial court erred in determining that Ms. Richardson had an easement to use the driveway. The court determined that Ms. Richardson presented sufficient evidence to demonstrate that she had both a prescriptive easement and an easement by necessity. Ms. Moore appeals both determinations and must prevail on both for us to reach a determination that Ms. Richardson does not have an easement to use the driveway. Alternatively, Ms. Richardson needs only prevail under one or the other to have a valid easement to use the driveway. *See Isaacs v. Fitzpatrick*, No. M2018-01863-COA-R3-CV, 2019 WL 3729857, at *14 (Tenn. Ct. App. Aug. 8, 2019) (pretermitting consideration of whether parties had an easement by necessity where it had been determined that they had established an implied easement by prior use).

We turn first to the prescriptive easement theory. A prescriptive easement is a type of implied easement "premised on the use of the property rather than language in a deed." *Shew v. Bawgus*, 227 S.W.3d 569, 578 (Tenn. Ct. App. 2007). As with all types of easements, a prescriptive easement "creates an enforceable right to use another's property for a specific purpose." *See Patton v. Campoy*, No. E2023-00231-COA-R3-CV, 2023 WL 8112821, at *9 (Tenn. Ct. App. Nov. 22, 2023) (citing *Pevear v. Hunt*, 924 S.W.2d 114, 115 (Tenn. Ct. App. 1996)); *Ingram v. Wasson*, 379 S.W.3d 227, 238 (Tenn. Ct. App. 2011) ("An easement is a right an owner has to some lawful use of the real property of another.").

Tennessee requires proof of the following elements to establish a prescriptive easement:

> [T]he usage must be adverse, under claim of right, continuous, uninterrupted, open, visible, exclusive, and with the knowledge and acquiescence of the owner of the servient tenement, and must continue for the full prescriptive period [of 20 years].

*Cumulus Broad., Inc. v. Shim*, 226 S.W.3d 366, 379 (Tenn. 2007). Although similar to the doctrine of adverse possession, a prescriptive easement "does not arise from absolute possession and control, but from a persistent and continuous use of a privilege less than that of ownership." *Shew*, 227 S.W.3d at 578 (quoting *Walker v. Huff,* No. E2005-01096-COA-R3-CV, 2006 WL 721308, at *7 (Tenn. Ct. App. Mar. 22, 2006)).

To show adverse usage sufficient to establish a prescriptive easement,

the use must be under a claim of right inconsistent with or contrary to the interest of the owner and of such a character that it is difficult or impossible to account for it except on the presumption of a grant; or use under a claim of right known to the owner of a servient tenement; or use whenever desired without license, or permission asked, or objection made such as the owner of an easement would make of it, disregarding entirely the claims of the owner of the land.

*Shoffner v. Urevbu*, No. W2024-00464-COA-R3-CV, 2025 WL 2795279, at *15 (Tenn. Ct. App. Oct. 1, 2025) (quoting *House v. Close*, 346 S.W.2d 445, 448 (Tenn. Ct. App. 1961)). "The actual owner must either have knowledge of the adverse possession, or the possession must be so open and notorious to imply a presumption of that fact." *Cumulus Broad.*, 226 S.W.3d at 377

A prescriptive easement is "an easement appurtenant," in which a dominant tract of land benefits in some way from use of the servient tenement. *Pevear v. Hunt*, 924 S.W.2d 114, 116 (Tenn. Ct. App. 1996). Accordingly, once such usage has been established for the requisite period of 20 years, a prescriptive easement will run with the land and bind subsequent owners of the servient estate. *Newman v. Woodard*, 288 S.W.3d 862, 865 (Tenn. Ct. App. 2008); *Tuggle v. Davies*, 232 S.W.2d 16, 17 (Tenn. 1950) (stating that the burden of proof to establish a defense affecting owners of the servient estate falls upon the party contesting the easement).

Here, the record reflects that the Richardsons had continuously and openly used the driveway in such a visible manner that the knowledge and acquiescence of the servient tenement's prior owners could be presumed for a period of greater than 20 years. Ms. Richardson testified that the Richardson family had been using the driveway since purchasing their property in 1975. Her son testified that his parents had been operating a farm on the property since around 1976 or 1977 and that he had joined in the venture in 1984. He stated that he kept commercial farming equipment in a garage on the property and that he had "always" driven such equipment on the driveway to reach the property, even through multiple ownership changes to the neighboring land. Ms. Richardson also testified to significant changes that she and her husband had made to the property, including having "a culvert put in and widen[ing] [it]" as well as having some trees "cut [down] at the drive." She explained that the Richardsons had "always kept the driveway up" and "always" fixed damage to the driveway that was caused by rain flowing downhill. Her son, too, testified that he had put in gravel "to fill up the ditches and gullies" in the driveway caused by the flow of rain for more than 40 years. He had "always fixed the driveway . . . for everybody that lived there" while prior owners resided in Ms. Moore's property. Additionally, Ms. Moore testified regarding and submitted photographs depicting Ms. Richardson mowing the area around the driveway at issue. The county sheriff and police chief, who had both lived in the area for decades, knew the Richardsons to use the driveway as the sole method of ingress and egress to their property. Although Ms. Moore testified

that she had given and then taken away permission for the Richardsons to use the driveway, the Richardsons proof presented through witness testimony indicated that they had openly and adversely used the driveway for more than 20 years during prior owners' possession of the land. Ms. Moore herself understood there to "have been a prescriptive easement" for the Richardsons to use the driveway "with other people" who owned the driveway before her.

Based on our review of the record, the trial court did not err in concluding that by clear and convincing evidence Ms. Richardson established a prescriptive easement through evidence that the driveway was used for ingress and egress — including by construction vehicles and commercial farming equipment – to the Richardson property continuously, without interruption, openly, visibly, exclusively, and with the knowledge and acquiescence of the servient tenement for the requisite time period of 20 years, which occurred prior to Ms. Moore's purchase of the land. Accordingly, we find no error in the trial court's conclusion that Ms. Richardson has a prescriptive easement, including for construction vehicles and commercial farming equipment, to use the driveway for ingress and egress to the property. Because we have determined that Ms. Richardson holds a prescriptive easement, we need not determine whether she also has an easement by necessity.

IV.

Ms. Richardson asserts that Ms. Moore's appeal is frivolous and that she is, therefore, entitled to attorney's fees and costs incurred in the appeal. Tennessee Code Annotated section 27-1-122 provides as follows:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

A frivolous appeal is one that is "utterly devoid of merit," *Combustion Eng'g, Inc. v. Kennedy*, 562 S.W.2d 202, 205 (Tenn. 1978), or has "no reasonable chance of success," *Davis v. Gulf Ins. Grp.*, 546 S.W.2d 583, 586 (Tenn. 1977). "Whether to award damages due to a frivolous appeal is a discretionary decision by the appellate court." *White v. Hayes*, 715 S.W.3d 657, 672 (Tenn. Ct. App. 2024).

In the exercise of our discretion in this case, we conclude that an award of attorney's fees and costs is not warranted under Tennessee Code Annotated section 27-1-122. Ms. Moore made legitimate and thoughtful arguments, and she cited to relevant law and facts in support of those arguments. Her appeal was unsuccessful, but it was not frivolous. *See Coolidge v. Keene*, 614 S.W.3d 106, 120 (Tenn. Ct. App. 2020).

V.

For the aforementioned reasons, we affirm the judgment of the Chancery Court for Houston County. Costs of this appeal are taxed to the appellant, Dianne Moore, for which execution may issue if necessary. The case is remanded for such further proceedings as may be necessary and consistent with this opinion.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE